GRAND RAPIDS NATIONAL BANK, PETITIONER, *v.* COMMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PHELPS-WATERS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 19327, 19419. Promulgated March 29, 1929.

*Jacob S. Seidman, Esq.*, and *Frank E. Seidman, C. P. A.*, for the petitioners.

*John F. Greaney, Esq.*, for the respondent.

## OPINION.

SIEFKIN: This proceeding is divided in two parts, one relating to the tax liability of the Wisconsin Chemical Co. for the calendar year 1920; the other relating to the liability of each of the two petitioners for such taxes as transferees of the assets of the Wisconsin Chemical Co. The deficiency letter to the Wisconsin Chemical Co. asserted a deficiency of $11,654.33, but it is admitted by the respondent in his brief that a payment of $5,417.79 has been made, so that the unpaid portion of the deficiency is $6,236.54.

The liability of the Wisconsin Chemical Co. depends upon the amount of a loss upon a sale of the assets of the company in 1920. The amount received on such sale was $40,000. The Wisconsin Chemical Co., on its tax return for 1920, deducted the sum of $87,196.28 as a loss on such sale, based upon a depreciated cost of $127,196.28 as shown by its books. The respondent reduced the loss and computed the tax asserted by him by reducing the basis of the assets sold by $80,602.53. Of this amount, $53,298.91 was caused by applying a depreciation upon a "straight line" basis to the years between acquisition and sale. The balance of the reduction resulted from the elimination of $5,793.73 from plant expenditures in 1907 and of $21,509.89 in 1912.

Considering, first, the elimination of the amounts of $5,793.73 and $21,509.89, the evidence shows that during the year 1907 the Wisconsin Chemical Co. spent substantial amounts for improvements, betterments and replacements and, according to its consistent policy, charged such amounts to expense during that year. When the books of the company were closed for the year 1907, however, it was determined by the company's officers that $5,793.73 represented capital expenditures which had been charged to expense and that sum was taken out of the operating account on the books of the company and put into a surplus account or construction account. In our opinion the respondent erred in eliminating such amount as a part of the

cost of the assets of the Wisconsin Chemical Co., the judgment of the officers of the company at that time as to the character of the expenditures being persuasive, and the evidence further indicating that such amount, in fact, was paid for capital items.

The item of $21,509.89 eliminated by the respondent from the 1912 plant expenditures is even more clearly a capital expenditure. The evidence is that during that year a fire destroyed the company's retort house and that it was rebuilt, substantially increasing the size and efficiency, at a cost of $29,785.87. Insurance collected because of the fire was $8,275.98 and the difference of $21,509.89 was charged to plant account. We believe that this amount was erroneously eliminated by the respondent in arriving at the cost of the assets sold.

The situation as regards depreciation on the assets of the Wisconsin Chemical Co. is as follows: The company used the depreciated cost of $127,196.28 at January 1, 1920, as shown by its books. The respondent, as shown by the deficiency letter, arrived at a value as at January 1, 1920, of $46,593.75 by the following method:

| | | |
|---|---:|---:|
| Plant and equipment Dec. 31, 1917 | | $186,983.17 |
| Less: Reserve and depreciation | | 106,771.60 |
| | | 80,211.57 |
| Depreciation, obsolescence and retirements: | | |
| 1918 | $17,286.80 | |
| 1919 | 16,331.02 | |
| | | 33,617.82 |
| Value Jan. 1, 1920 | | 46,593.75 |

The evidence in the proceeding shows that in deducting the $106,771.60 above the respondent went back to January 1, 1906, made a straight line computation of theoretical depreciation accrued during those years, and arrived at the conclusion that $53,298.91 more depreciation should have been taken up to December 31, 1917, than had been taken by the company on its books. According to the books of the company $53,472.69 had been taken as depreciation up to December 31, 1917. The petitioners point out that various other amounts were in effect deducted as depreciation by charging to its operating expenses additions to plant, renewals, replacements and betterments. Such items were, petitioners claim, $36,849.85 so spent between 1910 and 1917 in reconstruction work, as well as the additions to the charcoal buggies, the charcoal shed, the acetate storage shed and various other items set out in our findings of fact. Petitioners contend that, even if a theoretical straight line computation of the respondent is proper, such expenditures previously charged off must be taken into consideration in such a computation.

The difficulty we find in approving petitioner's argument is that in seeking to prove the book values right and the respondent's action wrong, the petitioners find it necessary to show that the books are not, in fact, right. They apparently concede that the amounts shown

by the books as representing depreciation are incorrect but say that the company should have reflected upon its books much larger sums for capital assets than were shown. They have shown several instances which prove that the books do not accurately represent the capital assets in a manner contemplated by the revenue acts or in a manner which will permit a more or less accurate determination of depreciation. In destroying the basis for depreciation, petitioners have also destroyed whatever presumption of correctness may be inherent in the books of the company, and by the rules of this Board are forced to prove the facts in order to meet the burden of proof. To the extent that such burden has been met, we have made findings but, in our opinion, such proof falls short of proving what the correct amount of depreciation is and in the absence of such showing, we must approve the respondent's determination upon that point. The cases cited by petitioners in which we have disapproved the use of a formula in computing depreciation are, so far as we know, all cases in which the petitioners' books reflected, so far as we could tell, the actual condition of the property as known at that time. Here, as we have seen, the petitioners themselves show that the books did not accurately reflect the facts upon which depreciation must be based.

The other issue in this proceeding is whether the petitioners are liable as transferees under section 280 of the Revenue Act of 1926, and if liable, the extent of such liability.

Section 280 is as follows:

SEC. 280. (a) The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this title (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):

(1) The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this title or by any prior income, excess-profits, or war-profits tax Act.

(2) The liability of a fiduciary under section 3467 of the Revised Statutes in respect of the payment of any such tax from the estate of the taxpayer. Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax.

(b) The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

(1) Within one year after the expiration of the period of limitation for assessment against the taxpayer; or

(2) If the period of limitation for assessment against the taxpayer expired before the enactment of this Act but assessment against the taxpayer was made within such period,—then within six years after the making of such assessment against the taxpayer, but in no case later than one year after the enactment of this Act.

(3) If a court proceeding against the taxpayer for the collection of the tax has been begun within either of the above periods,—then within one year after return of execution in such proceeding.

(c) For the purposes of this section, if the taxpayer is deceased, or in the case of a corporation, has terminated its existence, the period of limitation for assessment against the taxpayer shall be the period that would be in effect had the death or termination of existence not occurred.

(d) The running of the period of limitation upon the assessment of the liability of a transferee or fiduciary shall, after the mailing of the notice under subdivision (a) of section 274 to the transferee of fiduciary, be suspended for the period during which the Commissioner is prohibited from making the assessment in respect of the liability of the transferee or fiduciary, and for 60 days thereafter.

(e) This section shall not apply to any suit or other proceeding for the enforcement of the liability of a transferee or fiduciary pending at the time of the enactment of this Act.

(f) As used in this section, the term " transferee " includes heir, legatee, devisee, and distributee.

This section appears for the first time in the Revenue Act of 1926 and in explanation of the purpose of Congress in enacting it, the report of the Senate Committee on Finance stated:

Section 280: There are a number of situations in which the assets of the taxpayer have, subsequent to the accrual of his tax liability, been disposed of in whole or in part with the result that the Government can not successfully distrain or otherwise collect the full amount of the tax originally returned or found due as a deficiency. For example:

(1) Corporation A may distribute its assets to its stockholders and thereupon either dissolve or continue undissolved.

(2) Corporation A may sell its assets to corporation B for a fair consideration either in cash or property or in stock of B. The proceeds are transmitted directly by corporation B to the shareholders of corporation A thereupon either dissolves or continues undissolved.

(3) Corporation A may reorganize into a partnership.

(4) Corporation A may reorganize into corporation B by a mere change of name or State of incorporation or by an amendment of the financial provisions of its charter.

(5) Corporation A may impair its capital but have what are in effect distributed assets in the form of unpaid subscriptions of its shareholders.

(6) A husband may make a gift of the whole or part of his property to his wife.

(7) Personal property of a decedent may be transferred to the beneficiaries without prior settlement of taxes accruing during the life of the decedent.

(8) A decedent's estate with a claim for unpaid taxes accruing during the life of the decedent may be composed of real estate and pass directly by descent to the heirs.

In most of the above cases it is probable that under existing law the Government may proceed in equity by suit against the transferee if the transferor no longer exists (that is, in the case of a corporation, is dissolved, or in the case of an individual, is dead), and if the liability of the transferor has not been judicially established by action against the taxpayer before dissolution or death.—*Updike* v. *United States*, decided Circuit Court of Appeals, eighth circuit, December 1, 1925. If, however, the transferee is still in existence the Government must proceed to obtain judgment against the transferor in an action at law

and then proceed against the transferee in equity by a creditor's bill to satisfy the judgment. The creditor's bill is also available if the taxpayer has ceased to exist, but his tax liability was liquidated by judicial action prior to the dissolution or death.—*Swan Land and Cattle Co.* v. *Frank*, 148 U. S. 603. In all the above cases the transferee is not liable for the tax of the transferor, but is by reason of the receipt of the assets subject to an independent liability in his own person and payable out of his own estate, arising under the trust fund doctrine or some similar theory.

Again there are a number of situations in which, without reference to any principle of the trust fund doctrine or similar theory, an independent liability arises in respect of a person other than the taxpayer by reason of failure to pay from the taxpayer's estate the tax due from the taxpayer. An example of this is section 3467, Revised Statutes, under which every executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts, before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person or estate for the debts due to the United States, or for so much thereof as may remain due and unpaid.

Under existing law proceedings for the enforcement of liabilities such as those heretofore discussed are solely by court proceedings. No proceeding before the board for the redetermination of a deficiency and for the ultimate enforcement by assessment and distraint may be had.

It is the purpose of the committee's amendment to provide for the enforcement of such liability to the Government by the procedure provided in the act for the enforcement of tax deficiencies. It is not proposed, however, to define or change existing liability. The section merely provides that if the liability of the transferee exists under other law then that liability is to be enforced according to the new procedure applicable to tax deficiencies. Thus, upon notice of the liability sent by registered mail, the transferee may make payment and bring claim and suit for refund -or may with or without payment petition the board for redetermination with right to appeal to the higher courts. In either case the transferee has the opportunity to go before a court. If he chooses the option of petition to the board and review by the higher courts the liability may be enforced, in case of a decision favorable to the commissioner, by assessment and seizure in distraint proceedings by the officers of the Treasury Department, in place of similar summary proceedings by a United States marshal through the execution of a judgment in cases of other liability for debt.

The liability which arises in the transferee in respect of the receipt of the assets is normally to be measured by the liability of the transferor at the time of the transfer. This would include the amount of the tax due plus all interest, additional amounts, and additions to the tax provided by law, up to the time of such transfer. The section, however, provides that the liability of the transferee in this amount shall not in turn be subject to interest, additional amounts, or additions to tax, save that in case the transferee petitions the board for a redetermination of his liability, the amount so determined shall draw interest at the rate of 1 per cent a month commencing with notice and demand for payment following the final decision of the board.

Prior to the passage of the Revenue Act of 1926 the liability of transferees of assets was enforceable only by bill in equity brought by the United States in the United States District Court against such transferees. Such a bill sought relief upon the theory that legal remedies had been exhausted or were useless and that the peti-

tioners had received assets charged with the trust in favor of the United States to the extent of taxes due and unpaid by the transferor. One large class of cases was that of stockholders of dissolved corporations who received the assets of the corporation upon liquidation. Such liability was held to exist because the corporation had dissolved and a judgment at law would be useless against it, and formed the basis for a bill in equity to subject the assets received to the payment of the liability upon the "trust fund theory." It also rested upon the oft repeated rule that a distribution of assets can not be made to stockholders until creditors have been satisfied. See *Price* v. *United States*, 269 U. S. 42; *Pierce* v. *United States*, 255 U. S. 298; *Wood* v. *Dummer*, Fed. Case 17944; *Curran* v. *State of Arkansas*, 15 How. 304; *Sawyer* v. *Hoag*, 17 Wall. 610; *Northern Pacific Railway Co.* v. *Boyd*, 228 U. S. 482; *Kansas City Railway Co.* v. *Central Union Trust Co.*, 271 U. S. 445. The combination of these two principles has been applied in a number of cases brought by the United States against stockholders of dissolved corporations to collect taxes alleged to have been due from the corporations at the time the assets were distributed. See *United States* v. *McHatton*, 266 Fed. 602; *Capus Mfg. Co.* v. *United States*, 15 Fed. (2d) 528; *Dreyfus Dry Goods Co.* v. *Lines*, 18 Fed. (2d) 611; *Updike* v. *United States*, 8 Fed. (2d) 913; certiorari denied, 271 U. S. 661; *Boss and Peake* v. *United States*, 290 Fed. 167; *United States* v. *Capitol City Dairy Co.*, 252 Fed. 900.

The petitioners contend that any liability must be that proportion of the liability of the Wisconsin Chemical Company which the assets received by each petitioner bears to the entire amount of assets distributed.

Petitioner's liability, as shown above, rests upon the so-called trust fund doctrine. That doctrine had its origin in the language of Mr. Justice Story in his decision in *Wood* v. *Dummer, supra*. That was a suit in equity brought by creditors of a banking corporation to hold the stockholders liable, it appearing that the greater part of the capital of the corporation had been distributed to the stockholders as dividends, thus leaving the bank insolvent and its creditors unpaid. In the course of the opinion it was said:

The stockholders have no rights until all the other creditors are satisfied. * * * If the capital stock is a trust fund, then it may be followed by the creditors into the hands of any persons having notice of the trust attaching to it. As to the stockholders themselves, there can be no pretense to say that, both in law and in fact, they are not affected by the most ample notice. The doctrine of following trust funds into the hands of any persons who are not innocent purchasers or do not otherwise possess superior equities, has been long established.

Early in the history of the doctrine it was extended to include unpaid subscriptions to the capital stock. See *Sawyer* v. *Hoag*, 17

Wall. 610. That extension rested upon the theory that the capital of the corporation is the basis of its credit; that people who deal with the corporation have a right to assume that its paid-up capital is the same as represented; that if this representation is false, it is a fraud upon them, and that in case the corporation becomes insolvent, the law will say to the delinquent stockholders that they must pay up for the benefit of the creditors. This doctrine was then approved in *Hatch* v. *Dana*, 101 U. S. 205, where the Supreme Court said, in answer to a contention that all necessary stockholders were not joined in a creditors' bill to obtain payment of a judgment from unpaid stock subscriptions:

The liability of a subscriber for the capital stock of a company is several, and not joint. By his subscription each becomes a several debtor to the company, as much so as if he had given his promissory note for the amount of his subscription. At law, certainly, his subscription may be enforced against him without joinder of other subscribers; and in equity his liability does not cease to be several. A creditor's bill merely subrogates the creditor to the place of the debtor, and garnishes the debt due to the indebted corporation. It does not change the character of the debt attached or garnished. It may be that if the object of the bill is to wind up the affairs of this corporation, all the shareholders, at least so far as they can be ascertained, should be made parties, that complete justice may be done by equalizing the burdens, and in order to prevent a multiplicity of suits. But this is no such case. The most that can be said is that the presence of all the stockholders might be convenient, not that it is necessary. When the only object of a bill is to obtain payment of a judgment against a corporation out of its credits or intangible property, that is, out of its unpaid stock, there is not the same reason for requiring all the stockholders to be made defendants. In such a case no stockholder can be compelled to pay more than he owes.

In *Ogilvie* v. *Knox Insurance Company* (22 How. 380) the question was considered. That was a case in which several judgment creditors of a corporation had brought a creditor's bill against it and thirty-six subscribers to its capital stock. The bill alleged that the complainants had recovered judgments against the company, upon which executions had been issued and returned "no property;" that the other defendants had severally subscribed for its stock; and that the subscriptions remained unpaid, payment not having been enforced by the company. The prayer of the bill was that these other defendants might be decreed to pay their subscriptions, and that the judgments might be satisfied out of the sum paid. It was objected, as here, that the bill was defective for want of proper parties; but the court held the objection untenable. In delivering the opinion of the court, Grier, J., said: "The creditors of the corporation are seeking satisfaction out of the assets of the company to which the defendants are debtors. If the debts attached are sufficient to pay their demands, the creditors need look no further. They are not bound to settle up all the affairs of this corporation, or debtors. If A. is bound to pay his debt to the corporation in order to satisfy its creditors, he cannot defend himself by pleading that these complainants might have got their satisfaction out of B. as well. It is true, if it be necessary to a complete satisfaction of the complainants that the corporation be treated as an insolvent, the court may appoint a receiver, with authority to collect and receive all the debts due to the company, and administer all its assets. In that way all the other stockholders or debtors may be made to contribute." The court, therefore, directed

a decree against the respondents severally for such amounts as appeared to be due and unpaid by each of them for their shares of the capital stock.

The court then cited other cases to the same effect and said:

We hold, therefore, that the complainant was under no obligation to make all the stockholders of the bank defendants in his bill. It was not his duty to marshal the assets of the bank, or to adjust the equities between the corporators. In all that he had no interest. The appellants may have had such an interest, and, if so, it was quite in their power to secure its protection. They might have moved for a receiver, or they might have filed a cross-bill, obtained a discovery of the other stockholders, brought them in, and enforced contribution from all who had not paid their stock subscriptions. Their equitable right to contribution is not yet lost.

We believe the situation to be analagous and to dispose of the petitioners' contention that each distributee is liable only for a pro rata part of the tax of the transferor.

Whether the same result would be reached under section 602 of the Revenue Act of 1928 we do not decide, since this proceeding was heard before the passage of that Act and there is no evidence in the record showing the receipt of assets of the Wisconsin Chemical Co. by persons other than Phelps or the Grand Rapids National Bank.

In these proceedings the petitions allege that the Wisconsin Chemical Co. proceeded to wind up its business and was finally liquidated and went out of existence on January 16, 1922. This allegation of the petitions is admitted in the answer.

The petitioner in Docket No. 19327, the Grand Rapids National Bank, was a stockholder of the Wisconsin Chemical Co. and it is admitted that it received $5,557.75 in liquidating dividends upon the dissolution of that company, and that the company was thereby left without funds to pay the taxes due the United States. Such facts would form the basis of a liability upon the Grand Rapids National Bank by a bill in equity prior to the passage of the Revenue Act of 1926. We conclude, therefore, that the Grand Rapids National Bank is liable in this proceeding to the extent of the unpaid taxes of the Wisconsin Chemical Co. for 1920 and not exceeding the amount received by it in liquidation.

The Phelps-Waters Co., the petitioner in Docket No. 19419, was not a stockholder of the Wisconsin Chemical Co., but, as is shown by the findings of fact, received $3,800 from C. A. Phelps, who was a stockholder, $2,000 of such amount being received directly from Phelps and the other $1,800 being received by the Phelps-Waters Co. by virtue of an assignment from him. Such amounts were treated as contributions of capital by Phelps, and as we construe the relation of the parties, the company did not receive such assets charged with any trust, expressed or implied, in favor of the United States for taxes.

It is true that notice to Phelps may have been notice to the Phelps-Waters Co., since a corporation can have notice only through the natural persons who compose it, but in this proceeding the liability of Phelps as a distributee of assets of the Wisconsin Chemical Co. did not rest upon actual notice since the liquidating dividends were made in 1921 and 1922 and the deficiency letter to the Wisconsin Chemical Co. asserting the taxes in question was mailed May 19, 1925. The liability of Phelps rested, rather, upon his being a stockholder. As we see the situation it is that Phelps became liable because of the receipt, either by him or by his assignee, of the liquidating dividends and that the presumption of a trust fund can not be carried further without some evidence to justify it.

The fact that the money that Phelps paid or had paid to the Phelps-Waters Co. happened to have come from liquidating dividends of the Wisconsin Chemical Co. does not make the Phelps-Waters Co. the transferee of assets. The evidence shows that both Phelps and Waters advanced money from time to time to the Phelps-Waters Co. to take care of standing obligations, and that Phelps used the $3,800 in question in that manner. We believe that the respondent, in attempting to assert the liability against the Phelps-Waters Co., has mistaken the party liable, and that if anyone is liable it is Phelps and not the Phelps-Waters Co. The respondent was, therefore, in error in asserting a deficiency against the Phelps-Waters Co.

Petitioners urge that the Board hold section 280 to be unconstitutional. We considered this contention in *Henry Cappellini et al.*, 14 B. T. A. 1269, holding that the petitioners were not in a position to raise the point.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

VAN FOSSAN dissents.

———

PHILLIPS, concurring: While I agree with the result reached in the instant proceeding, I can not agree with that portion of the opinion which holds that the principle laid down by the Supreme Court in *Hatch* v. *Dana*, 101 U. S. 205, disposes of the measure of the liability of a transferee of the assets of a taxpayer. Whether that decision controls in determining the liability of transferees becomes important in other cases. If it is controlling, it follows that each transferee is liable to pay the whole tax to the extent of the value of the assets he may receive from the taxpayer, regardless of the number or situation of other like transferees. This would appear to be so whether or not the proceeding was governed by section 602 of the Revenue Act of 1928.

Section 280 of the Revenue Act of 1926 creates no new liability. It lays down only a new method of enforcing existing liabilities at law or in equity of a transferee of assets of a taxpayer. Our inquiry, then, is to determine what that liability is. It appears to be conceded that in the present instance the liability is one which is not cognizable at law but which arises in equity. A corporation distributes its assets to its stockholders without making provision for the payment of certain taxes which are unknown at the time. The stockholders take these assets without any knowledge of such liability. No fraud is involved. To what extent will equity permit recovery of the liability from one of such stockholders?

Justice Story had occasion to discuss this question in *Wood* v. *Dummer*, Fed. Case 17944. There he reached the conclusion that, in the absence of any showing that a pro rata part could not be collected from those stockholders who had not been joined in the action, equity would require those stockholders who were before the court to pay only their pro rata part. This case has been cited many times with approval by the Supreme Court and many other courts. I believe that it lays down the rule to be applied in cases arising under section 280. Each transferee is liable only for his pro rata part, if the balance is collectible from other transferees. No one of several transferees is liable for the full amount unless for some reason the liability of the others can not be enforced. This is not in conflict with the decision in *Hatch* v. *Dana*, *supra*, for there the court was enforcing a legal liability and not one which arises only through the intervention of a court of equity. The distinction is pointed out by the court in *Hatch* v. *Dana* in the following passage:

The case of *Wood* v. *Dummer*, upon which the appellants largely rely, was not an attempt to reach unpaid stock subscriptions. It was sought to follow the property of a corporation paid over to its shareholders before its debts were paid.

The opinion of the court in *United States* v. *Armstrong*, 26 Fed. (2d) 227, develops the same principles and discusses the cases at greater length than seems necessary in this concurring opinion.

The principles indicated above to be those which I believe should be applied, may not be laid down as invariable. They state what I believe to be the general rule which would be applied by a court of equity, subject to such modification as may be required to do equity in the circumstances of any particular case. To adopt the rule of legal liability followed in *Hatch* v. *Dana* as a principle which governs in determining the liability in equity of a transferee of assets is to disregard the functions of equity. It is inconsistent with equitable principles that an avoidable inequity should be done one person to do equity to another.

While I do not agree with the basis on which the opinion rests, I do agree with the result since this proceeding was heard before section 602 of the Revenue Act of 1928 became effective. At the time of the hearing the burden was upon the petitioner to show that the determination of the Commissioner was not correct. The presumption was that it was correct. This was not met by any proof which established that the facts were such that a court of equity would refuse to permit the entire liability to be asserted against the Grand Rapids National Bank. Because the burden was on petitioner and was not met, I concur in the decision reached.

---

GREEN, dissenting: I am unable to agree with that portion of the majority opinion dealing with the measure of the liability of the transferees. The conclusion there reached, is in part, at least, based upon the statement therein made that " prior to the passage of the Revenue Act of 1926, the liability of transferees of assets was enforceable only by a bill in equity brought by the United States in the United States District Court against such transferees." I do not believe the cases cited support an unqualified statement. I believe there are, in certain States, statutes which adequately protect those who seek to recover from transferees the amounts of their debts against the transferer. Courts of equity will not act where there is a complete and adequate remedy at law and it would seem to follow that if there was such an adequate remedy at law, there was no equitable liability. I know of no reason why the United States, in the recovery of taxes, has not at least the same rights as the ordinary individual in the matter of the recovery from transferees, and if it has the same rights as other creditors, then, clearly, courts of equity will not act where the remedy at law is plain, speedy, and adequate.

There is nothing in the record in this case, from which it can be determined whether the liability which the Commissioner here seeks to assert is a liability at law or a liability in equity, and it seems to me that, before the measure of the transferees' liability can be here determined, we must first ascertain whether the Commissioner seeks to assert a legal or an equitable liability, and whether, if equitable, there in plain, speedy, and adequate remedy at law. Unless these questions are determined, I fear that the rights of all parties involved will become hopelessly confused. It is true that the question here presented was not urged by counsel for the petitioner, but that is little justification for the redetermination by this Board of a liability against transferees, the nature of which, I, for one, do not know.

The reasoning adopted is that of a court of equity, and it seems to me that until it can be determined that this is properly a matter for the consideration of a court of equity, there is no justification for reasoning along such lines. As to the Michigan law prior to

that State's adoption of the Uniform Fraudulent Conveyance Act, see *Detroit Trust Co.* v. *Goodrich*, 175 Mich. 168; 141 N. W. 882. It may well be that the liability which the Commissioner here seeks to have established is one in equity, and that a court of equity, in an appropriate proceeding, would have considered it and arrived at the result here reached, but there is nothing in the record which justifies the conclusion that a court of equity would undertake the solution of the problems here involved. The essentials which must be established before a court of equity will take jurisdiction have not been proved.

----

MILLIKEN, dissenting: While I dissent on the merits of the tax liability determined, I will confine myself to the phase of the case as it relates to section 280. I have fully set forth my views on the unconstitutionality and the unworkability of section 280 in my dissenting opinion in *Henry Cappellini et al.*, 14 B. T. A. 1269, and will not repeat what I there said. I will now attempt to apply the views there set forth to the facts of these proceedings. The conclusions reached in the majority opinion serve to confirm me in the views reached in that dissenting opinion. We have before us two corporations which, so far as the record discloses, owe the Government no taxes but each of which has received a part of the assets of a corporation which does owe a deficiency in tax—a deficiency ascertained subsequent to the distribution of its assets. One of the petitioning corporations is found not to be liable and in this result I concur. The other petitioner is held liable for the deficiency but its liability is limited to the value of the assets received by it in the liquidation— this irrespective of what was received by the other stockholders and irrespective of the circumstances and conditions which existed at the time the distribution was made.

The majority opinion is based upon *Hatch* v. *Dana*, 101 U. S. 205. That case involved the direct liability of stockholders upon stock subscriptions, whereas here the liability is, as I pointed out in my dissenting opinion in the *Cappellini* case the pure creation of equity jurisprudence, enforceable only by a court of equity, and then upon equitable principles. The majority opinion overlooks the fact that in the *Hatch* case the Supreme Court took pains to point out that the appellants could have moved in that case for a receiver or that they could have filed a cross bill, obtained discovery, and enforced contribution. It is needless to point out that the Board can afford petitioners none of these remedies.

Since it appears the Board is now to resolve itself into a court of equity, it should at least attempt, as far as lies within its power, to administer this purely equitable doctrine upon equitable principles. In doing this I am of opinion that we should follow the Circuit

Court of Appeals for the Eighth Circuit in the rules laid down in *Updike* v. *United States*, 8 Fed. (2d) 912, and *United States* v. *Armstrong*, 26 Fed. (2d) 227, both of which involved deficiencies in tax which were ascertained and determined subsequent to the distribution of the assets of the taxpayer. It was held in these cases, and especially in the *Armstrong* case, that the tax liability of the taxpayer should be apportioned among the stockholders in the proportion which the amount of assets received by each bore to the amount of assets distributed to all. This is in accord with equitable principles and I believe the same rule should be applied in these proceedings. If the Board so decided the matter, it would be necessary to grant certain equitable relief or have the power to do so as a condition precedent to the application of the rule laid down in the two cases just cited.

LANSDON, TRUSSELL, and MORRIS concur in that part of MILLIKEN'S dissenting opinion relating to the extent of the liability of the transferees.