*Decision will be entered under Rule 50.*

FRANCIS L. HINE, AS TRANSFEREE OF COLONIAL BOAT WORKS, INC., TRANSFEROR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3719–64.    Filed July 30, 1970.

*John Wilcox* and *William J. Geen*, for the petitioner.
*Leo A. Burgoyne* and *James A. McNabb, Jr.*, for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined that petitioner was liable as transferee for deficiencies in Colonial Boat Works, Inc.'s Federal income tax for the fiscal years ending September 30, 1957, 1958, and 1959, in the amounts of $40,398.94, $35,670.58, and $35,802.68, respectively, plus interest as provided by law.

The issues for decision are:

(1) Whether petitioner is liable as transferee for the $17,802.68 in Federal income tax of Colonial Boat Works, Inc., for its fiscal year ended September 30, 1959, unpaid at the time of distribution of that corporation's assets to petitioner in February 1960.

(2) Whether petitioner is liable as transferee for the deficiencies in Federal income tax of Colonial Boat Works, Inc., in the amounts of $40,398.94, $35,670.58, and $18,000 for its fiscal years ended September 30, 1957, 1958, and 1959, respectively, which resulted from erroneous refunds tentatively made in September 1960 based on a claimed loss carryback from the short period of Colonial Boat Works, Inc., ended December 21, 1959.

(3) If petitioner is liable as transferee of Colonial Boat Works, Inc., whether the amount of his liability is limited to the $55,200 cash distribution received by him from that corporation or whether it includes the constructive receipt of an additional $84,800.

All of the facts have been stipulated and are found accordingly.

These stipulated facts, insofar as necessary to an understanding of the issues herein are:

1. Petitioner is an individual residing, at the time of the petition herein, at Roadstown-Greenwich Road, Bridgeton, New Jersey.

2. Colonial Boat Works, Inc. ("Colonial") was a New Jersey corporation which filed its federal income tax returns for its fiscal years ended September 30, 1957–1959, inclusive, with the District Director of Internal Revenue at Camden, New Jersey. Colonial was engaged in the business of manufacturing pleasure boats.

3. The issued and outstanding capital stock of Colonial consisted of 340 shares. At all material times prior to December 2, 1959 Petitioner owned 240 of such shares. The remaining shares were owned by one H.R.C. Elser ("Elser"). On December 2, 1959 Petitioner purchased the 100 shares owned by Elser for $10,000 and thus became the sole shareholder of Colonial.

4. Richardson Boat Co., Inc. ("Richardson"), was a New York corporation, also engaged in the manufacture of pleasure boats.

5. At all material times prior to December 21, 1959, approximately 91% of the capital stock of Richardson was owned by two individuals, Leon E. Travis ("Travis") and Matthies ("Matthies").

6. On March 15, 1956 Petitioner, Travis and Matthies entered into an agreement (the "Option Agreement"), providing that Travis and Matthies would have

an option, exercisable at any time within five years, to purchase 80% of the Colonial stock, 272 shares, at a price of $100 per share, a total of $27,200. The Option Agreement further provided, among other things, that for a period of five years, or so long as the Option Agreement remained in effect:

(a) Travis and Matthies would assume the active management of Colonial.

(b) The Board of Directors of Colonial would consist of Petitioner, Travis and Matthies.

(c) Travis and Matthies would have an irrevocable proxy to vote the 272 shares of Colonial stock covered by the option.

(d) Prior to, or at the time of, exercise of the option, Travis and Matthies would cause Colonial to repay its outstanding obligation to Petitioner and Elser of approximately $180,000, with interest.

    *        *        *        *        *        *        *

7. To implement certain provisions of the Option Agreement, Petitioner, Elser, Travis and Matthies entered into a second agreement providing for the creation of a voting trust covering the 272 Colonial shares subject to the option. * * *

8. Pursuant to the Option Agreement, Matthies and Travis took over the active management of Colonial. Thereafter Hine did not take an active part in the management of Colonial. As provided in the Option Agreement, the Board of Directors of Colonial was composed of Petitioner, Travis and Matthies. This composition continued unchanged until the dissolution of Colonial.

9. In 1959, as an alternative to the exercise of the option, a plan was formulated for the purchase of the Colonial assets by United Marine, Inc. ("United Marine"), to be organized as a Delaware corporation by Travis, Matthies, and certain other persons associated with them. A public offering of stock was planned to provide the funds necessary to consummate the purchase. Accordingly, Petitioner, Travis, Matthies, Richardson, Colonial and United Marine entered into an agreement (the "Purchase Agreement") dated June 18, 1959, providing for the sale of the Colonial assets to United Marine. The Purchase Agreement also provided that United Marine was to purchase all of the assets of Richardson, and certain related assets owned individually by Travis, Matthies and Hine. * * * At all material times, Travis and Matthies constituted the active management of United Marine.

10. The Purchase Agreement included the following provisions (except as otherwise indicated, references are to the pertinent Sections of Article II):

(a) The Closing ("Closing") of the acquisition would be held on September 30, 1959, the last day of Colonial's fiscal year. (Section F.) This date was subsequently extended to December 21, 1959. * * *

(b) The purchase price for the Colonial assets was to be $140,000 together with the assumption of all of the liabilities of Colonial, expressly including any federal or state income taxes for Colonial's fiscal year ended September 30, 1959 and for the additional period up to the date of closing. (Section B–1.) The purchase price of $140,000 was based on the book net worth of Colonial at September 30, 1958, which was substantially equal to that amount .

(c) Colonial would prepare its federal and state income tax returns as soon as reasonably practicable after the closing and submit them to United Marine for its approval. (Section G–7.)

(d) Colonial was to dissolve and distribute its assets to stockholders as soon as reasonably practicable on or after the date of the Closing. (Section G–6.)

(e) Matthies and Travis agreed to sell to United Marine, for $84,800, their option to purchase 80% of the Colonial stock from Petitioner. The $84,800 was equal to the difference between 80% of the $140,000 purchase price to be paid for

the Colonial assets and the $27,200 option price on 80% of the Colonial stock under the Option Agreement. Payment by United Marine was to be made at the Closing. (Article V, Section A.)

(f) Petitioner agreed to pay to United Marine, at the Closing, the sum of $84,800 for the release of the option to purchase 80% of the Colonial stock. (Article V, Section B.)

11. The closing of the sale of the Colonial assets was held on December 21, 1959, following the adoption on November 17, 1959, of a plan of complete liquidation of Colonial pursuant to section 337 of the Internal Revenue Code of 1954.[1] * * * At the Closing, all of the assets of Colonial (except for Colonial's corporate franchise, corporate charter, seal, minute and stock books, and other corporate records pertaining to its corporate organization or capitalization) were transferred to United Marine, and United Marine assumed all of the liabilities of Colonial, including indebtedness to Petitioner of approximately $65,000. In satisfaction of the purchase price of $140,000 payable by United Marine to Colonial, and in satisfaction of the obligation of Petitioner to pay to United Marine the amount of $84,800 for the release of the option on the Colonial shares, all as provided in the Purchase Agreement, United Marine paid to Colonial the net amount of $55,200. Since the net payment by United Marine of $55,200 satisfied Petitioner's obligation to pay to United Marine the amount of $84,800 for the release of the option on the Colonial shares, Colonial never requested reimbursement from Petitioner for such amount, and Petitioner never made any payment to Colonial relevant thereto. United Marine took immediate possession of the Colonial assets, and thereafter was in complete control of such assets.

12. Late in February, 1960, pursuant to the plan of liquidation, Colonial distributed to Petitioner in exchange for his stock the net amount of $55,200 which had been received from United Marine.

13. Colonial filed a certificate of dissolution, pursuant to applicable New Jersey law, on July 12, 1960.

14. Prior to December 21, 1959, Colonial timely filed its federal income tax returns for its fiscal years ended September 30, 1957 and 1958, and paid federal income taxes in the amounts of $40,393.94 and $35,088.84, respectively. * * * On audit, Respondent determined a deficiency in the amount of $581.74 for the fiscal year ended September 30, 1958, which was accepted by Colonial and paid on September 11, 1959.

15. On December 15, 1959, Colonial filed a request for an automatic extension of time in which to file its federal income tax return for its fiscal year ended September 30, 1959. Upon such filing, Colonial paid the amount of $18,000 against its federal income tax liability for such year.

16. Subsequent to December 21, 1959, the federal income tax return of Colonial for its fiscal year ended September 30, 1959 was filed, showing a total tax of $35,802.68 for such year, of which $18,000 had previously been paid as stated in

---

[1] The return of information, Form 966, required by sec. 6043, I.R.C. 1954, was filed with respondent's Camden, N.J., office on Dec. 4, 1959. Attached to this information return was a copy of the resolution adopted on Nov. 17, 1959, which stated as follows :

"RESOLVED, That the company adopt a plan of complete liquidation, in accordance with Section 337 of the United States Internal Revenue Code, which plan is as follows :

All assets of the company shall be converted into divisible assets as soon as possible and be distributed among the shareholders of the company, in proportion to their share holdings, as soon as possible, but, in no event, on a date later than one year from the date of the adoption of the plan of liquidation ; and it was further so

RESOLVED, That the Board of Directors and the officers of the company are directed and authorized to perform all acts necessary to accomplish this objective."

paragraph 15, leaving an unpaid balance of $17,802.68.[2] This return was prepared by Colonial's auditors, A. M. Pullen & Company, of New York. * * *

17. The amount of $35,802.68 was the correct federal income tax of Colonial for its fiscal year ended September 30, 1959.

18. Since under the Purchase Agreement United Marine had the right to approve Colonial's federal income tax return for the period ending December 21, 1959 prior to filing, had assumed liability for the tax of such period, and had possession of the books and records of Colonial, United Marine suggested that it undertake the preparation of Colonial's final federal income tax return for this period, and Colonial agreed. The return was prepared by Shea & Company, of Villanova, Pa., United Marine's auditors, and filed with the District Director of Internal Revenue in Camden, New Jersey on or about May 6, 1960. The return was signed by Earl W. Nickerson ("Nickerson"), as Secretary of Colonial. Nickerson commenced his employment with Colonial in 1954 as a bookkeeper. Following the assumption of active management of Colonial by Travis and Matthies in 1956, he became Secretary of Colonial, and as such signed its federal income tax returns, including its final return. Upon the sale of assets, he became Assistant Secretary of the Colonial Boat Division of United Marine. He resigned this office in February, 1960, but continued in the employ of United Marine on a consultant basis until May, 1960.

19. The final return of Colonial for the short period ended December 21, 1959 showed a net operating loss of $251,209.53. The return was accompanied by an Application for Tentative Carryback Adjustment, Form 1139, also signed by Nickerson as Secretary of Colonial, showing a carryback of said loss to the three preceding taxable years of Colonial. * * *

20. On September 28, 1960, Colonial's application for tentative carryback adjustment under the provisions of section 6411 of the Internal Revenue Code of 1954 was allowed, and on October 3, 1960, three refund checks in the amounts of $42,121.15, $37,191.22 and $18,749.03, were issued by the United States, payable to Colonial, representing a refund of the federal income tax previously paid by Colonial for its fiscal years ended September 30, 1957–1959, inclusive, together with interest. Under the allowance of Colonial's application for tentative carryback adjustment, the unpaid amount of $17,802.68 of Colonial's tax for its fiscal year ended September 30, 1959 was satisfied by credit of the loss carryback from the period ended December 21, 1959. The three refund checks were endorsed and deposited in the account of United Marine in Philadelphia National Bank on October 7, 1960. The endorsement was handwritten, all in the same handwriting, and in the following form:

Colonial Boat Works, Inc.
for deposit only
United Marine, Inc.

*　　*　　*　　*　　*　　*　　*

21. Petitioner did not review the final return of Colonial, and had no actual knowledge of its contents or of the receipt of the refund checks prior to December, 1962, when he was contacted by Respondent's agents as to the question of his liability as transferee of Colonial assets.

22. Petitioner did not receive, directly or indirectly, any part of the proceeds of any of the refund checks. Petitioner did not receive any further distribution from Colonial after the distribution of $55,200 in February, 1960.

---

[2] The record shows that an extension for filing the return was granted to Mar. 15, 1960, and the return was filed within the extended period.

23. Subsequent to the making of the refunds described above, Respondent audited Colonial's final return for the period ended December 21, 1959, and determined that Colonial did not sustain any net operating loss for such period and that accordingly the refunds previously made on the basis of the claim of such loss were erroneous. Therefore, on October 26, 1962, Respondent, under the provisions of Section 6213(b)(2) of the Internal Revenue Code of 1954, made assessments of income tax against Colonial in the amounts of $40,398.94, $35,670.58 and $35,802.68 for its fiscal years ended September 30, 1957, 1958 and 1959, respectively, based upon the disallowance of the tentative adjustment allowance of the refunds which had previously been granted. Said assessments restored the unpaid amount of $17,802.68 of Colonial's tax for its fiscal year ended September 30, 1959 which previously had been satisfied by credit of the loss carryback from the period ended December 21, 1959. Said assessments are still outstanding and have not been paid.

24. On June 1, 1962, United Marine filed a voluntary petition in bankruptcy and pursuant thereto was adjudicated bankrupt.

25. The taxable income, federal income tax and income after tax of Colonial for its fiscal years ended September 30, 1957–1959, inclusive, was as follows:

| Year ended | Taxable income | Tax | Income after tax |
|---|---|---|---|
| 1957 | $88,267.19 | $40,398.94 | $47,873.25 |
| 1958 | 78,055.46 | 35,670.58 | 42,384.88 |
| 1959 | 79,428.26 | 35,802.68 | 43,625.48 |

26. The book value of the capital stock of Colonial at September 30, 1959 was $183,395.23.

27. Except for the amount of $17,802.68 of tax for the fiscal year ended September 30, 1959 satisfied by credit as described in paragraph 20 above, the unpaid assessments of Colonial determined by Respondent result solely by virtue of the refund payments made in October, 1960.

Respondent in his notice to petitioner determined that petitioner was liable as transferee of Colonial Boat Works, Inc., for the total unpaid deficiencies of that corporation in the amount of $111,872.20 plus interest as provided by law and that such amount did not exceed the total proceeds received by petitioner from the sale of the assets of Colonial Boat Works, Inc.

Section 6901, I.R.C. 1954,[3] provides for the collection of income

---

[3] All references are to the Internal Revenue Code of 1954.

SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

    (1) INCOME, ESTATE, AND GIFT TAXES.—

        (A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

            (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

    \*        \*        \*        \*        \*        \*        \*

(h) DEFINITION OF TRANSFEREE.—As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, \* \* \*

taxes from transferees and section 6902(a)[4] places on respondent in a case in this Court the burden of showing that a petitioner is liable as a transferee.

There must, of course, be an unpaid tax of the transferor. However, respondent's determination that there are unpaid taxes or deficiencies in tax of the transferor is presumed to be correct. The burden placed on respondent by statute is to show the liability of the transferee for the unpaid taxes or deficiencies in tax of the transferor.

To meet his burden of proof respondent must show that the transfer of assets was without adequate consideration, that the transferor was insolvent at the time of the transfer or was rendered insolvent by the transfer,[5] and either that he has exhausted his remedies against the transferor, or that to proceed against the transferor would be a useless gesture. *Stewart C. Holmes*, 47 T.C. 622, 626 (1967), and *Kreps* v. *Commissioner*, 351 F. 2d 1, 8 (C.A. 2, 1965), affirming 42 T.C. 660 (1964). Respondent also has the burden of establishing the value of the assets received by the transferee. *R. E. Burdick*, 24 B.T.A. 1297, 1308 (1931).

The facts here show that the transfer of Colonial's assets to petitioner was a liquidating distribution for petitioner's stock. Such a transfer is one which has long been recognized to result in the stockholders of the liquidated corporation being liable for the corporation's debts existing at the time of distribution. *Grand Rapids National Bank*, 15 B.T.A. 1166, 1176 (1929). The facts also show that Colonial had no assets after the distribution and transfer to petitioner for his stock in late February 1960. It had a liability of $17,802.68 for income tax even though its final return showing this liability may not have been filed at the time of the distribution. In determining whether Colonial was insolvent at the time of transfer, its liability for Federal income tax, even if unknown or contingent, must be taken into consideration. *J. Warren Leach*, 21 T.C. 70, 76 (1953).

Petitioner argues that Colonial was not insolvent at the time of distribution to petitioner nor rendered insolvent thereby since its remaining tax liability had been fully provided for by means of the

---

[4] SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES.

(a) BURDEN OF PROOF.—In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

[5] In his brief respondent contends that under the trust-fund theory applicable in New Jersey, insolvency is not the test for transferee liability. In each of the three cases cited by respondent, the Court found that all assets of the corporation were distributed without providing for the debt involved. These circumstances create insolvency under N.J. Stat. Ann. sec. 25 : 2–8 (1940). We therefore do not consider this contention of respondent to be in accord with New Jersey law, but rather consider the New Jersey law to be as petitioner contends, that a transferee for inadequate consideration of a corporation holds the assets he receives in trust for creditors of the transferor corporation if the corporation is insolvent or is rendered insolvent by the transfer.

agreement with United Marine to pay such tax. Petitioner states that where the assets of a corporation are transferred to a second corporation in exchange for stock of the second corporation, the value of the stock received is taken into account in determining whether the first corporation is insolvent and concludes that on the same theory the obligation of United Marine to discharge any tax liability of Colonial should be valued in determining whether Colonial was insolvent. Petitioner contends that the obligation of United Marine was backed by the full assets which Colonial transferred to it and, therefore, was a more valuable asset than would be stock of United Marine or an account receivable of that corporation. Petitioner recognizes that a number of cases have held that the shareholders of a liquidated corporation are liable as transferees notwithstanding the assumption of liability by the purchaser of the assets of the corporation, and also recognizes that a corporation cannot divest itself of liability for taxes by a contract to which the United States is not a party, providing for payment of those taxes by another. *John H. Humbert*, 24 B.T.A. 828, 829 (1931). Petitioner takes the position that neither of these principles precludes the obligation of a third party from being taken into consideration in determining the solvency of the transferor corporation. There are a number of cases which refuse to recognize such a contract as an asset to be considered in determining the solvency of a transferor. However, in the instant case there is a further reason for rejecting petitioner's contention.

Petitioner in his argument overlooks the fact that the transfer of Colonial's assets to him was pursuant to the complete liquidation and dissolution of that corporation so that the value of the enforceable right, whatever that value may have been, was distributed to petitioner along with the cash distribution. The resolution of dissolution specifically provides for distribution to the shareholders of all assets of Colonial. *Coca-Cola Bottling Co. of Tucson* v. *Commissioner*, 334 F. 2d 875, 878 (C.A. 9, 1964), affirming 37 T.C. 1006 (1962).

Since Colonial was without assets after February 1960 and was dissolved in July of that year, any attempt to collect the taxes due from Colonial from the corporation would be a useless gesture.

Petitioner argues that he should not be liable for the $17,802.68 because respondent is in no worse position than he would have been if the $17,802.68 had been paid in cash prior to the transfer of assets to petitioner. The refunds granted in September 1960 gave credit for the $17,802.68. Petitioner argues that had the amount been paid in cash the refund check for the fiscal year ended September 30, 1959, would have been increased by the amount of such payment. Petitioner contends that for this reason the tax should be considered as paid after

the transfer and argues that where, after the transfer the tax liability is paid, the liability of the transferee, as such, is extinguished relying on *Elaine Yagoda*, 39 T.C. 170 (1962), affd. 331 F. 2d 485 (C.A. 2, 1964).

At the time of the transfer Colonial had a liability for tax for the fiscal year ended September 30, 1959, in the amount of $17,802.68. In September 1960 it tentatively received credit for the $17,802.68 which was still unpaid. When at a later date it was determined that Colonial did not have an operating loss for the period ended December 21, 1959, this credit was determined to be erroneous. A credit based on a tentative carryback adjustment under section 6411 is not equivalent to payment but is merely what the statute terms it, "tentative." See *Blansett v. United States*, 283 F. 2d 474, 479 (C.A. 8, 1960), in which the Court stated that "the disallowance of the carryback or credit had the effect, for all practical purposes of restoring plaintiff's tax liability for the year 1948 to precisely what it was before they applied for and received allowance of the tentative carry-back." See also *Pearl Zarnow*, 48 T.C. 213 (1967). On the basis of the record we conclude that there was no "payment" of the $17,802.68 so as to relieve petitioner of liability for that tax as transferee.

Since the $55,200 which the parties agree petitioner received in exchange for his stock is in excess of the tax liability of $17,802.68 petitioner is liable for the total $17,802.68 plus interest as transferee of Colonial.

Whether petitioner is liable as transferee for deficiencies of Colonial Boat Works, Inc., resulting from tentative refunds based on a loss carryback from the short period of October 1, 1959, through December 21, 1959, which were later determined by respondent to be erroneous, presents a different problem. The final distribution of Colonial's assets to petitioner was sometime late in February 1960. At that time Colonial Boat Works, Inc., had no unpaid income tax other than $17,802.68 for its fiscal year ended September 30, 1959. The return for Colonial for the short period ended December 21, 1959, filed on or about May 6, 1960, showed a loss in excess of $250,000 which was claimed as a loss carryback to the fiscal years ended September 30, 1959, 1958, and 1957.

On September 28, 1960, the application for tentative carryback adjustments under the provisions of section 6411 was allowed and on October 3, 1960, three refund checks in the amount of $42,121.15, $37,191.22, and $18,749.03, were issued by the U.S. Treasury payable to Colonial. The three refund checks were endorsed and deposited in the account of United Marine at Philadelphia National Bank on October 7, 1960. Petitioner had no knowledge of the claimed loss carryback, the

refunds, or the determination of deficiencies against Colonial when the refunds were determined to be erroneous until December 1962.

These facts would not relieve petitioner of transferee liability if it could be said that the debt of Colonial to the United States existed at the time of the transfer of Colonial's assets to petitioner. However, in our view such an indebtedness did not exist at that time or on July 12, 1960, when the certificate of dissolution of Colonial was filed with the State of New Jersey. In *Kelley* v. *United States*, 30 F. 2d 193 (C.A. 9, 1929), the full amount of the estate tax imposed on the entire community estate of the decedent was paid, but subsequently a refund was made of a portion thereof. After allowance of the refund the Commissioner determined that the refund was without authority of law and notified the executrix that there remained unpaid estate tax in the amount of the refund which he determined to have been erroneous. The court said (30 F. 2d at 193) :

When once paid, a tax is gone, and a refund of the money does not restore it. "If the owner or any other person entitled to make payment of the tax shall do so, the lien will not only be discharged absolutely, but all authority to proceed further against the property will be at an end." Cooley on Taxation (3d Ed.) p. 810. From this view, we know of no dissent. Thus, in *Mason* v. *City of Chicago*, 48 Ill. 420, and *Hudson* v. *People*, 188 Ill. 103, 58 N.E. 964, 80 Am. St. Rep. 166, it was held that the payment of a special assessment discharged the lien, and that the lien could not be reinstated by a mere refund of the amount paid.

Also see *Etta Craig, Executrix*, 18 B.T.A. 86 (1929). In *Elaine Yagoda*, *supra*, we adopted this same view. In that case we stated (39 T.C. at 185) :

When the distribution was made, on April 9, 1945, the trust's original return for 1944 had already been filed and the $13,491.63 tax shown thereon had been paid. Thereafter, on or about May 15, 1945, the amended return was filed and the additional amount of $3,942.15 shown thereon to be due was then paid. Thus, by May 15, 1945, an aggregate of $17,433.78 had been paid in behalf of the trust. Its taxes for 1944 were then fully paid. At that point it owed the Government nothing further, and Lena's liability as a transferee was then fully discharged.

The liability which the Commissioner now asserts arises because of the subsequent erroneous overassessment. To be sure, the trust has again become liable for 1944 taxes; but that liability, in the peculiar context of this case, is the consequence of events which transpired long after Lena became a transferee. Her transferee liability came to an end no later than May 15, 1945, when the 1944 taxes were fully paid. If she became liable subsequently in connection with the erroneous overassessment, such liability was not that of a transferee in the circumstances of this case. We express no opinion upon whether the Government may have some other remedy against Lena, but we hold that her liability as transferee had been fully discharged prior to the overassessment, and that she did not become chargeable again *as a transferee*.

At the time of transfer of Colonial's assets to petitioner, Colonial owed only $17,802.68 in taxes for the fiscal year ended September 30, 1959. Its Federal income tax return for the short period ended De-

cember 21, 1959, had not been filed but this record shows that Colonial owed no tax for that period. Here, as in *Elaine Yagoda, supra*, petitioner is not liable as a transferee of Colonial for taxes erroneously refunded after the transfer of assets. The record shows that respondent was notified of the dissolution of Colonial in accordance with law and that refund checks were issued to Colonial after such notice was given and after Colonial had filed its certificate of dissolution with the State of New Jersey. Petitioner did not receive these checks and had no knowledge of their being drawn. We are therefore not called upon to decide what effect on petitioner's liability receipt of the refund checks, or even knowledge of their receipt, by someone at United Marine would have had. This record does not disclose the individual who actually received these checks and deposited them to the account of United Marine, but it does disclose that petitioner was not this person. Under the facts here present, petitioner received no transfer of assets from Colonial either actual or constructive after or simultaneously with the indebtedness, if any, which arose from Colonial to the United States upon the making of the erroneous refund.[6] Since we have held that petitioner is not liable as a transferee of Colonial for any income tax except the $17,802.68 plus interest thereon as provided by law, we need not decide whether petitioner constructively received $84,800 as a transfer from Colonial. Both parties recognize that the $55,200 transfer which petitioner actually received is in excess of any liability of petitioner resulting from the $17,802.68 of unpaid income tax of Colonial existing at the time of the transfer of assets to petitioner.

*Decision will be entered under Rule 50.*

---

[6] This case involves only the issue of petitioner's liability as transferee. We are therefore not called upon to determine whether the income tax return of Colonial for the period ended Dec. 21, 1959, and the claim for tentative carryback adjustment were properly filed or whether there existed any authority in anyone, and if so in whom it existed, to cash the checks drawn to Colonial. See the discussion in *Segal* v. *Rochelle,* 382 U.S. 375 (1966), with respect to whether a loss carryback claim is property of a bankrupt or his trustee.