PERFUMERS MANUFACTURING CORPORATION, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66863. Filed December 17, 1959.

*Gerald Silbert, Esq.,* for the petitioner.
*Clarence P. Brazill, Jr., Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined that the petitioner is liable as a transferee for deficiencies in income and personal holding company taxes of petitioner's transferor, as follows:

| Year | Deficiency | |
|---|---|---|
| | Income tax | Personal holding company surtax |
| Fiscal year [1] ended Mar. 31, 1952 | | $16, 066. 14 |
| Fiscal year ended Mar. 31, 1953 | $5, 342. 93 | 12, 715. 50 |
| Fiscal period Apr. 1, 1953 to Mar. 5, 1954 | 4, 518. 06 | 8, 760. 83 |
| Total | 9, 860. 99 | 37, 542. 47 |

Certain royalty payments which were due petitioner's transferor under a contract were not paid during the years in question. The question is whether transferor, reporting on an accrual basis, realized royalty income in the years in question, or whether certain payments in earlier years constituted advance royalty payments.

### FINDINGS OF FACT.

Some of the facts are stipulated and they are found accordingly.

Pinaud, Inc., a New York corporation, was for many years engaged in business as a manufacturer and distributor of perfume and toiletry products, under worldwide trademarks and trade names, particularly under the name "Pinaud." It kept its books and prepared its income tax returns on a March 31 fiscal year basis on an accrual method of accounting. On March 5, 1954, Pinaud, Inc., was consolidated with Perfumers Manufacturing Corporation, petitioner herein, by a statutory consolidation under the laws of New York and as a result Pinaud, Inc., was dissolved. Pinaud, Inc., filed its income tax returns for the fiscal years ended March 31, 1952, and March 31, 1953, and for the period ending March 5, 1954, the date of its dissolution, with the district director of internal revenue for the lower Manhattan district of New York.

The business of Pinaud, Inc., had been a profitable one prior to World War II, but it suffered several reversals after the war because of its obligations, usual in the perfume and toiletry trade, to accept sizable returns of unsold merchandise from customers who had purchased and paid for its products but had failed to sell them. The volume of returns was large and Pinaud, Inc., found itself required to issue substantial merchandise credits to its customers representing a liability to deliver merchandise for which it would not be paid. To add to its difficulties, Pinaud, Inc., found itself unable to meet its cash liabilities.

Pursuant to an agreement entered into on June 24, 1947, Pinaud, Inc., transferred its entire business to Ed. Pinaud, Inc. (then known

---

[1] All references to fiscal years herein are to the fiscal years of petitioner's transferor, Pinaud, Inc.

as Barbara Alice, Inc.), hereinafter referred to as Ed. Pinaud, which was, and is, owned by persons unrelated to the owners of Pinaud, Inc. Supplementary agreements dated July 15, 1947, and November 25, 1953, were signed to resolve differences of the parties.

Under article second and article fifteenth of the June 24 agreement, Ed. Pinaud was granted the exclusive general agency to manufacture, sell, and distribute "Pinaud" products for 15 years with the option to renew for additional terms of 15 years. Provision for the return of the business to Pinaud, Inc., in the event of termination of the agreement was made in article sixteenth. The consideration for the transfer of the business was set forth in article thirteenth of the June 24 agreement, in part, as follows:

THIRTEENTH: Ed. Pinaud agrees to pay to Pinaud, Inc. a sum equal to 4% of the annual net sales of Pinaud products sold by Ed. Pinaud, including the sale of new products developed by Ed. Pinaud. If the net annual sales as provided for hereunder exceed $600,000 per annum, the payment on all such excess over and above $600,000 shall be reduced from 4% to 3%. * * * Ed. Pinaud hereby guarantees that such annual payment shall be not less than $20,000 for each year consisting of twelve (12) full months that this agreement shall be in effect. * * * No future percentage instalment payments under this Article THIRTEENTH shall be due and payable by Ed. Pinaud until all sums charged against said payments shall have been met. Percentage payments made in any one year in excess of the minimum provided herein may be applied toward minimum percentage payments due in any subsequent consecutive three additional years. * * *

In the November 25, 1953, agreement the only modification material here was a reduction of the minimum to $7,500 beginning with December 1, 1953. Except for the calculation of minimum royalty for the period April 1, 1953, through March 5, 1954, this reduction has no effect upon the outcome of the case.

Merchandise returns were provided for in some detail in the June 24 agreement but these provisions were altered by article second of the July 15 agreement which is, in part, as follows:

Second. There are presently outstanding on the books of Pinaud, Inc. Accounts Receivable Credit Balance totalling approximately $28,655.80. Of this sum approximately $17,790.87 represents credits given by Pinaud, Inc. to its customers for reasons other than merchandise returns, and the balance of $10,864.93 represents credits arising out of merchandise returns. In addition, there are on hand merchandise returns credits which have been authorized by Pinaud Inc. but have not yet been set up on its books of account, in the sum of approximately $80,000.

(A) Ed Pinaud will, subject to the provisions hereof, accept the responsibility for said merchandise returns in the sum of approximately $80,000 and said merchandise credits set up on the books of Pinaud Inc. in the sum of approximately $10,864.93 and will issue credit memos therefor redeemable only in merchandise. It shall remain entirely in the discretion of Ed Pinaud as to when it shall issue said credit memos. Ed Pinaud will charge Pinaud Inc. for the amount of credits so issued, less the sum of $16,000, and such charge

shall be reimbursed to Ed Pinaud, in full, by Pinaud Inc. giving it a credit therefor against the future percentage payments payable, under article "Thirteenth" of the said contract of June 24, 1947, by Ed Pinaud to Pinaud, Inc.

\* \* \* \* \* \* \*

(B) If any customer of Pinaud Inc. shall since June 24, 1947, have returned or attempted to return to Ed Pinaud any merchandise shipped or delivered to it by Pinaud Inc. on or before June 24, 1947 or shall hereafter return or attempt to return any such merchandise, it shall rest entirely in the discretion of Ed Pinaud as to whether or not it shall accept said return and issue a merchandise credit therefor. Ed Pinaud may refuse to accept said merchandise and issue a merchandise credit therefor even though Pinaud Inc. has authorized the return of said merchandise by the customer. If Ed Pinaud shall, in its discretion, accept the return of any such merchandise and issue merchandise credits therefor (whether or not Pinaud Inc. has authorized the return of such merchandise) then to the extent of the first aggregate $84,000 of such credit memoranda the liability therefore shall be assumed by Ed Pinaud to the extent of 50% thereof and by Pinaud Inc. to the extent of 50% thereof. The 50% to be borne by Pinaud, Inc. shall be reimbursed to Ed. Pinaud by Pinaud Inc. giving it an immediate credit therefor against the future percentage payments payable, under article "Thirteenth" of the said contract of June 24, 1947, by Ed Pinaud to Pinaud Inc. If Ed. Pinaud shall, in its discretion, accept the return of any such merchandise and issue merchandise credits therefor (whether or not Pinaud Inc. has authorized the return of such merchandise) in any amounts exceeding said aggregate sum of $84,000, then to the extent of such issued merchandise credits exceeding $84,000 the liability therefor shall be borne exclusively by Pinaud Inc. and shall be reimbursed to Ed Pinaud for the full amount thereof by Pinaud Inc. giving it an immediate credit therefor against the future percentage payments payable, under article "Thirteenth" of the said contract of June 24, 1947, by Ed. Pinaud to Pinaud Inc.

In addition to providing for Ed. Pinaud's assuming the liability to issue credits to customers and deliver merchandise for returns, the contract of transfer also provided that Ed. Pinaud pay certain sums in cash. The contract provides these sums, when so paid, "shall be charged to Pinaud, Inc., against future percentage payments, payable by Ed. Pinaud to Pinaud, Inc. under Article THIRTEENTH and duly credited to Ed. Pinaud, Inc." It is stipulated that in the year ended March 31, 1948, Ed. Pinaud paid $52,000 in cash to Pinaud, Inc., under these clauses of the contract, and it is further stipulated that said payment of $52,000 constituted "advanced royalty payments from Ed Pinaud in the fiscal year ended March 31, 1948" and that said cash payment was properly reportable in income by Pinaud, Inc., in that year.[2]

---

[2] Paragraph 11 of the stipulation of the parties provides as follows: "The parties agree that Pinaud [Inc.] erroneously treated the $52,000 paid to it by Ed. Pinaud in its fiscal year ended March 31, 1948 as reportable, $15,000 in the fiscal year ended March 31, 1948, $20,000 in the fiscal year ended March 31, 1949, and $17,000 in the fiscal year ended March 31, 1950, whereas the entire amount of $52,000 was properly reportable in its fiscal year ended March 31, 1948. Therefore, respondent properly excluded the $20,000 and $17,000 from Pinaud's [Inc.] income in the fiscal years ended March 31, 1949 and March 31, 1950, respectively, which adjustments are reflected in the statutory notice herein."

Article sixth of the July 15, 1947, agreement provided, as follows:

Sixth. Said contract of June 24, 1947, and this agreement contain various provisions by which Ed. Pinaud may, from time to time, become entitled to credits against the payments to be made by it to Pinaud Inc. pursuant to the provisions of article "Thirteenth" of said contract of June 24, 1947. It is agreed that if at any time in the future the financial condition of Pinaud Inc. will reasonably permit it to do so, without interfering with its normal business operations, it will, from time to time, promptly reimburse Ed. Pinaud in cash for all such unused credits as may, from time to time, be outstanding in favor of Ed. Pinaud.

It is admitted that in accordance with the provisions of article second, *supra*, Ed. Pinaud issued its credit memos and delivered its merchandise in satisfaction of the credit memos in the following amounts and in the following fiscal taxable periods of Pinaud, Inc.:

| | |
|---|---:|
| Fiscal year ended Mar. 31, 1948 | $72,482.20 |
| Fiscal year ended Mar. 31, 1949 | 10,775.33 |
| Subtotal | 83,257.53 |
| Less: Adjustment for correction | 13,190.97 |
| Balance | 70,066.56 |
| Fiscal year ended Mar. 31, 1950 | 4,076.51 |
| Subtotal | 74,143.07 |
| Less: Adjustment for correction | 13.33 |
| Balance | 74,129.74 |
| Fiscal year ended Mar. 31, 1951 | 2,566.47 |
| Fiscal year ended Mar. 31, 1952 | 328.72 |
| Total | 77,024.93 |

In each of the fiscal years ended March 31, 1948, through March 31, 1953, 4 per cent of the sales of Pinaud products by Ed. Pinaud was less than $20,000.

In the fiscal years 1948, 1949, and 1950, Pinaud, Inc., did not report as income amounts corresponding to the value of merchandise delivered to customers by Ed. Pinaud in satisfaction of the credit memos, as above. Instead, on its income tax return, Pinaud, Inc., included $20,000 in gross income as royalty income, and then took deductions against income for merchandise credits issued and satisfied by Ed. Pinaud which included $72,482.20, $10,775.33, and $4,063.18 [3] for the fiscal years 1948, 1949, and 1950, respectively.

Beginning with the fiscal year 1951, Pinaud, Inc., changed its method of reporting the amounts of merchandise delivered by Ed.

[3] These amounts are stipulated. The $13.33 difference between the credit memos issued by Ed. Pinaud in the amount of $4,076.51 and $4,063.18 which Pinaud, Inc., deducted was due to an error which was later corrected. See table, page 5.

Pinaud to satisfy its merchandise credit memos. In a statement attached to its tax return in the fiscal year 1951, Pinaud, Inc., stated that in prior years it had used an erroneous method of reporting the $20,000 minimum royalty and deducting merchandise returns; that the minimum royalty of $20,000 was improperly reported and the cash payment of $52,000 should have been reflected as income in the fiscal year 1948, and the merchandise credits issued and discharged by Ed. Pinaud and charged against Pinaud, Inc., should have been reflected as royalty income. The statement further indicated that since the returns for the fiscal years 1948 through 1950 "reflected losses no amended returns are being filed." In spite of this statement, Pinaud, Inc., reported the minimum royalty of $20,000 as income in the fiscal year 1951 but instead of offsetting the $20,000 of royalty income due under the agreement by the amount of sales credits actually made by Ed. Pinaud in the fiscal year 1951, i.e., $2,566.47, Pinaud, Inc., offset the $20,000 royalty income with $20,000 of sales credits, unused for setoffs in prior years.

In the fiscal year 1952 merchandise credits amounted to $328.72, and in the fiscal years 1953 and 1954 there were no merchandise credits actually made by Ed. Pinaud in respect of their agreements with Pinaud, Inc. In the fiscal years 1952 and 1953 Pinaud, Inc., continued the practice of reporting the minimum royalty of $20,000 each year as income and offsetting the same with $20,000 of merchandise credits, unused for prior years. In its return for the period April 1, 1953, to March 5, 1954, Pinaud, Inc., reported $15,312.50 [4] as royalty income due under the contract and offset the same with $15,312.50 of sales credits unused for prior years.

The Commissioner challenged this treatment in his notice of deficiency and disallowed $19,671.28 ($20,000 minimum less $328.72 merchandise credits) in the fiscal year 1952; $20,000 in the fiscal year 1953, and $15,312.50 in the fiscal period 1954, stating that these amounts were not properly deductible in the taxable years involved. As a result, liability for deficiencies in corporate income tax and personal holding company surtax was determined against petitioner as transferee of Pinaud, Inc. Petitioner admits transferee liability and has assumed and agreed to pay all taxes finally determined to be due from Pinaud, Inc., for the years in question.

OPINION.

The consideration for the transfer of the business by Pinaud, Inc., to Ed. Pinaud was the percentage payment provided in article thirteenth. In the stipulation and briefs the parties called this per-

---

[4] This figure results from computing the minimum from April 1 to November 30, 1953, at $20,000 and from December 1, 1953, through March 5, 1954, at $7,500.

centage payment a royalty and we will do the same. The royalty of 4 per cent of Ed. Pinaud's gross sales, or $20,000, whichever amount was larger, was to be paid by Ed. Pinaud to Pinaud, Inc., each year. This was the ultimate liability of Ed. Pinaud under the 1947 contract. While the contract provided for the payment by Ed. Pinaud of cash ($52,000) in 1947 and the issuance and discharge of Pinaud, Inc.'s customers' merchandise credits, by Ed. Pinaud, these provisions were directly related to article thirteenth providing for the royalty payments. In the contract the cash payments which Ed. Pinaud was to make and the dollar amounts of the merchandise credits which Ed. Pinaud was to issue and satisfy were made a charge or credit against the article thirteenth percentage or royalty payments.

The sole question to be determined is whether the merchandise credits, issued and discharged by Ed. Pinaud, and charged against Pinaud, Inc., in the prior years and in stipulated amounts, constituted prepayment of the royalty which would otherwise be income to Pinaud, Inc., during the years in question.

In one of the adjustments here made, involving loss carryovers from fiscal years 1949 and 1950, respondent determined the cash payment of $52,000 was an advance royalty payment, and income in 1947 when it was paid, and that Pinaud, Inc., could not postpone the recognition of any part of it as income to later years. Petitioner agrees with this adjustment and the parties stipulate the $52,000 was advance royalty in fiscal 1948. Petitioner contends the dollar amounts of merchandise credits issued and discharged by Ed. Pinaud, in years prior to the years involved, should likewise be held to be advance payments of royalty.

Respondent does not question that Pinaud, Inc., had accrued liabilities to deliver merchandise to satisfy return credits. It is also undisputed that Ed. Pinaud, as part of the consideration for transfer of the business, assumed and discharged these liabilities by delivering its merchandise to the former Pinaud, Inc., customers before the tax years in question. It is stipulated that Ed. Pinaud not only assumed Pinaud, Inc.'s liabilities for returns by issuing its credit memos to said customers but satisfied them by delivering its merchandise to Pinaud, Inc.'s customers during the years prior to the years in question. In short, Ed. Pinaud paid Pinaud, Inc.'s liabilities for returns in the manner in which they were payable, i.e., by the delivery of merchandise. We see no pertinent difference between the payments in cash (which respondent recognizes was a prepayment of future royalty) and the discharge of Pinaud, Inc.'s liabilities on the merchandise credits. It is certainly clear that the parties, by their contract, intended both the cash payment and the dollar amount of assumed and discharged liabilities to be prepayments of

royalty. The contracts say unequivocally that the cash payments Ed. Pinaud makes will "be charged against" future royalties and that the merchandise liabilities Ed. Pinaud assumes and discharges will be a "credit therefor against" or "an immediate credit therefor against" future royalties.

We do not understand that respondent argues prepayment of royalty income could not be realized by the assumption and discharge of merchandise obligations. His argument is that it was not accomplished here, for, in spite of all of the language in the contract making the assumption and discharge of merchandise liabilities credits against future royalty payments, there was another clause providing for the payment of such liabilities in cash.

Respondent refers to article sixth of the July 15, 1947, agreement which we have set forth in our Findings of Fact. There, mention is made of the various provisions of the contract by which Ed. Pinaud was to be entitled to credits against royalty payments and following this the further statement is made: "It is agreed" that Pinaud, Inc., is to make reimbursement in cash from time to time for such unused credits "if at any time in the future the financial condition of Pinaud Inc. will reasonably permit it to do so, without interfering with its normal business operations."

Respondent's argument is that because of the contingent obligation to reimburse Ed. Pinaud, in cash, for unused credits, contained in article sixth, the assumption and discharge of the merchandise credits by Ed. Pinaud was not the "equivalent" of a cash payment to Pinaud, Inc., and, therefore, cannot be treated as prepayment of royalty. Since article sixth was equally applicable with respect to the cash payment credits, it is clear the assumption and discharge of the merchandise credits was precisely "equivalent" to the $52,000 cash payment that was actually made under this contract—at least for the purpose of determining the advance royalty issue as to the amounts of merchandise credits assumed and discharged.

The liability for reimbursement, which was made contingent on an extraordinary recovery by Pinaud, Inc. (Pinaud, Inc., reported loss of over $300,000 in fiscal 1948), applied alike to *all* credits against royalty and it can afford no basis for respondent's inconsistent treatment of the credits resulting from the cash payment and the credits resulting from the assumption and discharge of merchandise liabilities. Actually the royalty income was realized when the cash was paid and when the merchandise credit liabilities were assumed and discharged. The realization of this royalty income cannot be postponed by such a contingent obligation to reimburse. *Crossett Timber & Development Co.*, 29 B.T.A. 705.

It is admitted that Ed. Pinaud's cash payments to Pinaud, Inc., which were to be used to discharge the obligations of cash creditors of Pinaud, Inc., were "charged against" future royalties. Both parties cite *C. H. Mead Coal Co.*, 31 B.T.A. 190, as authority for the cash payment being prepayment of royalty. In precisely the same way Ed. Pinaud's discharge of the obligations of merchandise creditors of Pinaud, Inc., were made a credit against future royalties. The same rule applied to both: They were both prepayments of royalty and taxable when made. The sum of the cash payments and the assumption and discharge of credits for merchandise deliveries to the customers of Pinaud, Inc., absorbed the royalties which otherwise would have come due during the later years here in question.

We hold petitioner's transferor, Pinaud, Inc., received prepayments of royalty in the years prior to the years in question in amounts in excess of the royalty payments that would have been due in the years before us, but for the prepayments. Consequently, Pinaud, Inc., did not have income in the sum of $19,671.28 in the fiscal year ended March 31, 1952, or $20,000 in the fiscal year ended March 31, 1953, or $15,312.50 in the fiscal period ended March 5, 1954.

It is stipulated that there were merchandise credits assumed and discharged by Ed. Pinaud in the sum of $328.72 in the fiscal year ended March 31, 1952. Petitioner admits this sum should have been included by Pinaud, Inc., in income in that year.

*Decision will be entered under Rule 50.*