HAROLD ARLEN AND ANYA ARLEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2109–65. Filed August 3, 1967.

*Benjamin Alpert* and *Myles J. Sachs*, for the petitioners.
*William F. Chapman*, for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1959 in the amount of $41,413.

The only remaining issue is whether an amount of $50,000 received in 1959 by petitioner Harold Arlen, a composer of popular music, from Music Publishers Holding Corp. was received as a bona fide loan or was received as advance royalties.

Other errors were assigned but have been agreed upon. Effect will be given to these agreements under Rule 50.

## FINDINGS OF FACT

The stipulated facts are found as stipulated.

Petitioners [1] are husband and wife with residence in New York, N.Y., on the date when the petition in this proceeding was filed. They filed their joint calendar year Federal income tax return for 1959 on the cash basis with the district director of internal revenue, Manhattan District, New York, N.Y.

The notice of deficiency was mailed to petitioners on January 19, 1965. In a statement attached to the notice petitioners were advised of the following:

### ADJUSTMENTS TO INCOME

| | | |
|---|---:|---:|
| Taxable income as disclosed by return | | $80,292.00 |
| Unallowable deductions and additional income: | | |
| (a) Advance royalties | $45,000.00 | |
| (b) Royalty income | 20,000.00 | |
| (c) Travel and entertainment expense | 1,500.00 | |
| (d) Studio expense | 250.00 | |
| (e) Medical expenses | 971.00 | 67,721.00 |
| Taxable income as corrected | | 148,013.00 |

### EXPLANATION OF ADJUSTMENTS

(a) It is held that the amount of $50,000.00 received by you in 1959 from Music Publishers Holding Corporation is includible in your gross income for that year. Inasmuch as you reported only $5,000.00, your gross income has been increased by the difference, or $45,000.00.

Only adjustment (a) remains in issue.[2]

Petitioners are also known as Harold Arluck and Anya Arluck.

Petitioner is a composer of popular music of modern times.

Harms, Inc., M. Witmark & Sons, Remick Music Corp., Advanced Music Corp., and New World Music Corp. are music-publishing companies and each of them is a wholly owned subsidiary of Music Publishers Holding Corp. which in turn is a wholly owned subsidiary of Warner Bros. Pictures, Inc.

Between 1929 and 1943 petitioner assigned all his right, title, and interest to 46 musical compositions to the above-mentioned five music publishing companies, hereinafter sometimes referred to as the publishers. This assignment extended for the term of the original copyright period of 28 years from first publication for each of said musical compositions.

---

[1] Hereinafter wherever the term petitioner is used, it refers to petitioner Harold Arlen, and wherever the term petitioners is used, it refers to Harold and Anya Arlen.

[2] It may be noted, however, that the parties agree that adjustment (b) should be in the total amount of $18,543.26 instead of $20,000. Adjustments (c) through (e) were not assigned as errors.

The names of the musical compositions, the year when the original copyrights were issued, and the publishers to which the musical compositions were assigned are as follows:

| Year | Title | Publisher |
|------|-------|-----------|
| 1929 | Gladly | M. Witmark & Sons |
|  | Get Happy | Remick Music Corp. |
| 1930 | Contagious Rhythm | Do. |
|  | Hittin' the Bottle | Do. |
|  | Linda | Do. |
|  | The March of Time | Do. |
|  | One Love | Do. |
|  | Out of a Clear Blue Sky | Do. |
|  | Song of the Gigolo | Do. |
|  | You Wanted Me, I Wanted You | Do. |
|  | Learn to Croon | Advanced Music Corp. |
|  | Sweet and Hot | Do. |
|  | What Do We Care | Do. |
|  | While You Were Young | Do. |
|  | You'll Do | Do. |
| 1931 | You Said It | Do. |
|  | If He Really Loves Me | Do. |
|  | It's Different With Me | Do. |
|  | Tell Me With a Love Song | Do. |
|  | I Love a Parade | Harms, Inc. |
| 1932 | I Gotta Right to Sing the Blues | Do. |
|  | Rockin' in Rhythm | Do. |
|  | Satan's Lil Lamb | Do. |
|  | Two Feet in 2/4 Time | Do. |
| 1933 | It's Only a Paper Moon | Do. |
|  | Shame on You | Do. |
| 1934 | Fun to be Fooled | New World Music Corp. |
|  | Let's Take a Walk Around the Block | Do. |
|  | Shoe'in the Mare | Do. |
|  | What Can You Say in a Love Song | Do. |
|  | You're a Builder Upper | Do. |
| 1936 | Fancy Meeting You | Harms, Inc. |
|  | In Your Own Quiet Way | Do. |
|  | Let's Put Our Heads Together | Do. |
|  | Speaking of the Weather | Do. |
|  | I Love to Sing-A | Remick Music Corp. |
|  | Save Me Sister | Do. |
|  | You're the Cure for What Ails Me | Do. |
| 1941 | Blues in the Night | Do. |
|  | Hang on to Your Lids Kids | Do. |
|  | Says Who, Says You, Says I | Do. |
|  | This Time the Dream's on Me | Do. |
| 1942 | Captain of the Clouds | Do. |
| 1943 | All Out for Freedom | Harms, Inc. |
|  | Now I Know | Do. |
|  | Tess' Torch Song | Do. |

On March 3, 1959, petitioners entered into an agreement with the said five publishers covering the renewal terms of the copyrights of the respective musical compositions which had previously been assigned to the said publishers. The agreement transferred and assigned to the respective publishers the respective musical compositions for the renewal term of the copyrights thereof for another 28 years.

Petitioner's wife was made a party to the agreement of March 3, 1959, because of the provisions of title 17 of the United States Code, section 24 of the copyright law.

On March 1, 1959, petitioners addressed a letter agreement to Music Publishers Holding Corp., the body of which is as follows:

In order to induce us to enter into a Copyright Renewal Agreement with Harms, Inc., M. Witmark & Sons, Remick Music Corporation, Advanced Music Corporation and New World Music Corporation, dated March 3, 1959, we hereby acknowledge receipt of a loan from you to us in the sum of Fifty Thousand ($50,000.)

Dollars, which sum we agree to repay to you in ten (10) yearly installments of Five Thousand ($5,000.) Dollars each, subject to the terms and conditions herein contained.

We agree that you may, and we hereby authorize you to, apply to said debt, any royalties payable to either of us under the terms of the Agreement dated March 3, 1959 in the following manner:

You may apply a total of Five Thousand ($5,000.) Dollars annually against any such royalties during each of the ten (10) years starting March 1, 1959 and ending February 28, 1970. If at the end of any annual period there remains any unpaid balance, then you shall have the right to recoup any such remaining unpaid balance against any future royalties in addition to the Five Thousand ($5,000.) Dollars annual repayment.

Annual royalties payable pursuant to the Agreement dated March 3, 1959 in excess of Five Thousand ($5,000.) Dollars plus any prior unpaid balances shall be paid in accordance with the terms of the aforesaid Agreement.

Your right to recoup any unpaid balances shall continue during the entire life of the Agreement dated March 3, 1959 and shall not be restricted to the ten (10) year period ending February 28, 1970.

As further evidence of our debt, we are delivering to you herewith ten (10) promissory notes, each in the amount of Five Thousand ($5,000.) Dollars. If for any reason you are not possessed of all of the Harold Arlen interests in the United States renewal copyrights covered by the Copyright Renewal Agreement dated March 3, 1959, we agree to pay these promissory notes as due.

This agreement shall be binding on our heirs and personal representatives.

Petitioner executed 10 promissory notes, each dated March 27, 1959, payable to the order of Music Publishers Holding Corp., and each in the amount of $5,000. The first note was due on March 27, 1960, and each of the other notes was due serially thereafter; the second, March 27, 1961; the third, March 27, 1962; etc., through March 27, 1969. Each note was a negotiable promissory note with no restriction or conditions contained therein affecting the rights of the payee to negotiate the same and making them fully enforceable against petitioner. As a sample we set forth the third note due March 27, 1962, as follows:

$5,000.00                                                              March 27, 1959
Three (3) years_____after date I promise to pay to the order of Music Publishers Holding Corp_____Five Thousand ($5,000.00)____Dollars at 488 Madison Avenue, New York City.
Value received
No. _____ Due 3/27/62                          (Signed) HAROLD ARLEN

The first of these notes was paid during the calendar year 1959 by the application of the royalties due petitioner from the five publishers, and the $5,000 was included in petitioners' income for the year 1959.

During each of the succeeding years, 1960 through 1966, inclusive, $5,000 of the royalties, otherwise payable to petitioner, was used to pay off the $5,000 promissory notes held by Music Publishers Holding Corp. and at the present time there are only two notes still unpaid, that is, the notes due March 27, 1968, and March 27, 1969.

Each of the first eight notes was prepaid before the due date thereof because of the application of the royalties earned during the respective years prior to the due dates of the notes.

When Music Publishers Holding Corp. paid over the $50,000 to petitioner on March 30, 1959, the transaction was recorded on its books as a debit to notes receivable and a credit to cash.

The royalties earned by petitioner from the copyrights which were the subject of the agreement dated March 3, 1959, were as follows:

| Year | Royalties | Year | Royalties |
|---|---|---|---|
| 1957 | $6,008.56 | 1962 | $10,369.83 |
| 1958 | 5,903.67 | 1963 | 9,284.40 |
| 1959 | 5,000.00 | 1964 | 8,559.53 |
| 1960 | 7,407.17 | 1965 | 7,850.70 |
| 1961 | 15,006.82 | | |

The statements submitted to the petitioners by the publishers through Music Publishers Holding Corp. indicated the earnings of such musical compositions separately and the company obligated to make payment of the royalties.

When petitioners executed the letter agreement of March 1, 1959, with Music Publishers Holding Corp. for the loan therein stated of $50,000, the value of the royalties to be received by petitioner from the renewal copyrights assigned to Music Publishers Holding Corp. as *collateral* for the indebtedness therein stated was more than sufficient to secure adequately the repayment of the $50,000 due from petitioner.

ULTIMATE FINDINGS OF FACT

The 10 notes in the face amount of $5,000 each, which petitioner issued to Music Publishers Holding Corp. on March 27, 1959, were intended to and in fact did represent a bona fide loan from Music Publishers Holding Corp. to petitioner.

The $50,000 loan received by petitioner did not constitute income to petitioners in the year 1959 except to the extent of $5,000 of royalties earned and applied to the repayment of the first note in that year.

OPINION

Petitioner contends that the $50,000 he received in 1959 from Music Publishers Holding Corp. was borrowed money and consequently not income except to the extent of the $5,000 of royalties applied as payment of the first note, whereas respondent contends that the $50,000 so received was in substance received as advance royalties and taxable as ordinary income.

There can be no question but that in form an indebtedness was created by the giving of the 10 notes. Respondent, however, argues that the $50,000 paid petitioner by Music Publishers Holding Corp.

was intended as advance royalties and that the giving of the notes was unrealistic and a sham, citing *Victor H. Heyn*, 39 T.C. 719. We do not agree with the respondent. Not only was the transaction in form a loan but, under the circumstances of this case, that was also its substance.

The circumstances under which the $50,000 was paid and the 10 notes given cannot be treated lightly.

Section 24 of title 17 of the United States Code among other things provides:

Sec. 24. Duration; renewal and extension

The copyright secured by this title shall endure for twenty-eight years from the date of first publication, * * * *Provided*, That * * * the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That * * * the author of such work, *if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright* in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication. [Emphasis supplied.]

Between 1929 and 1943 petitioner had assigned all his right, title, an interest to the 46 musical compositions for the term of the *original* copyright period provided for in section 24, *supra*, which was "for twenty-eight years from the date of first publication." The "date of first publication" of the 46 musical compositions is not shown in the record, but the time had arrived for considering the making of the necessary application for renewal and extension for another 28 years. Both petitioners and the publishers were financially interested in having the copyrights renewed and extended for the reason that, if no application therefor was made within the time prescribed, the original copyrights would terminate at the expiration of 28 years from date of first publication and anyone in the world could then publish the composition of the expired copyright without having to pay a royalty. Petitioner was one of the famous composers of popular music of modern times and his compositions were earning money for both the publisher and petitioner.

An author's rights to the renewal of a copyright are quite fully discussed in three decisions of the U.S. Supreme Court. See *Fisher Co.* v. *Witmark & Sons*, 318 U.S. 643 (1943); *DeSylva* v. *Ballentine*, 351

U.S. 570 (1956) ; and *Miller Music Corp.* v. *Daniels, Inc.*, 362 U.S. 373 (1960). In the *Fisher* case it was held that an author's right to obtain a renewal and extension of his copyright is assignable by him by an agreement made before the expiration of the original copyright term. In *DeSylva* v. *Ballentine*, it was held: (1) That after the author's death, the widow and children of the author succeed to the right of renewal as a class, and (2) that the term "children" as used in section 24, *supra*, includes an illegitimate child. In the *Miller* case, the Supreme Court, among other things, said:

> The category of persons entitled to renewal rights therefore cannot be cut down and reduced as petitioner would have us do. Section 24 reflects, it seems to us, a consistent policy to treat renewal rights as expectancies until the renewal period arrives. When that time arrives, the renewal rights pass to one of the four classes listed in § 24 according to the then-existing circumstances. Until that time arrives, assignees of renewal rights take the risk that the rights acquired may never vest in their assignors. A purchaser of such an interest is deprived of nothing. Like all purchasers of contingent interests, he takes subject to the possibility that the contingency may not occur. For example, an assignment from an author and his wife will be ineffective, if on his death another woman is the widow. Examples could be multiplied. \* \* \*

Under section 24, *supra*, the order of succession for the renewal term of the copyrights is as follows: (1) Author, (2) widow and children, (3) executor, if there is a will, (4) next of kin.

An assignment by an author of the renewal rights to a copyright made before the original copyright expires is valid against the world if the author is alive at the commencement of the renewal period. Likewise, each member of the successor class must survive the expiration of the original term in order to obtain a vested interest in the renewal copyright term. Any attempted assignment by any one of the class who fails to survive the expiration of the original term of the copyright is void. *Fisher Co.* v. *Witmark & Sons; DeSylva* v. *Ballentine; Miller Music Corp.* v. *Daniels, Inc.*, all *supra*.

At the time of the execution of the agreement of March 3, 1959, petitioners were without children. Petitioner's wife was made a party to the agreement of March 3, 1959, because, under section 24, *supra*, if petitioner had died before the expiration of the original term, the attempted assignment of the copyrights for the renewal term thereof by petitioner alone would have been void against his wife unless she was a party to the agreement. It was thus possible to make provision for the first contingency, that of the widow making application in case the author is not living. It was not possible to make provisions for any of the other contingencies provided for in section 24. An assignee of a renewal expectancy cannot obtain assurance prior to the time the renewal vests for the reason that the assignor may die before the expiration of the original term. If the author (or other assignor of the

renewal expectancy) dies before the expiration of the original term, then those persons who by statute succeed to the renewal rights are not bound by any assignment executed by the author (or by any assigning member of a prior renewal class) so that the assignee takes nothing. *Miller Music Corp.* v. *Daniels, Inc., supra.* Even if the assignee obtains assignments from the wife and children and other known members of the successor class, it is possible for the parties to be divorced, or additional children to be born or adopted, which would make the assignment invalid as against the new wife or newly adopted or afterborn children. As to some of the compositions here in question, the time for some of these contingencies has not at the present time expired.

Thus, there was a very real and valid business purpose for making the advance of $50,000 to petitioner in the form of a loan evidenced by negotiable, unconditional promissory notes. In the event of the happening of any of the contingencies which would make the assignment of the renewal rights by petitioners void, the publisher would be fully protected by the notes. The notes were negotiable and unconditional and, although they were non-interest bearing, the payee could have discounted them and petitioner would have had to pay the notes when they became due.

Respondent contends, however, that petitioner was not required to repay the $50,000 except out of the royalties to be received and that the parent company could only look to the collateral, namely, the royalties for repayment under any and all circumstances. We do not agree with this contention. Both parties to the March 1, 1959, letter agreement were domiciled in the State of New York, and the said letter agreement is subject to interpretation under the laws of the State of New York.

In *First Trust & Deposit Co.* v. *Potter*, 278 N.Y.S. 847 (1935), the defendant executed a promissory note and collateralized it with a pledge of various securities. The plaintiff, after demanding payment, brought an action on the note. The defendant moved for dismissal on the ground that collateral had been deposited and that the plaintiff had failed to apply the collateral to reduce the amount of the loan. In holding for the plaintiff the Supreme Court, Onondaga County, among other things, said:

The obligation of the debtor to pay the debt is the same as if no security had been given * * *.

   *       *       *       *       *       *       *

While it may be argued that, on account of the wording of the instrument, the intent was that, in the first instance, before a recovery on the note be had, there should be realization upon the collateral, that reasoning is specious. * * *

To the same effect are *Jefferson County Nat. Bank* v. *Dusckas*, 2 N.Y.S. 2d 336, 339 (1938); *Manufacturers Trust Co.* v. *Hollinger*, 141 N.Y.S. 2d 795, 798 (1955); and *First Trust & Deposit Co.* v. *W. W.*

*Conde Hardware Co.*, 262 N.Y.S. 2d 565, 568–569 (1965). In the latter case, the Supreme Court, Onondaga County, said:

It has long been well settled that the bank cannot be charged with liability for failing to sell or be compelled to sell collateral pledged to it on account of a loan. * * *

It is important to recognize that if the creditor may only look to the collateral for repayment why would the debtor execute and deliver fully negotiable promissory notes containing no restriction on the enforceability thereof. The execution and delivery of these notes to the creditor clearly indicate that all parties to the agreement considered the transaction to be a loan and that the creditor could enforce payment thereof. The notes were set up on the books of Music Publishers Holding Corp. as "notes receivable." In view of the circumstances herein set forth it would be unrealistic to hold that the payment of the $50,000 in 1959 to petitioner was in substance a payment of advance royalties rather than a loan.

The case of *Victor H. Heyn, supra,* is clearly distinguishable on the facts. The purported promissory notes in *Heyn* were nonnegotiable, without substance, and as such had to be disregarded. Victor H. Heyn, the maker of the purported notes, did not pay anything on the notes and it was not expected that he would pay anything. The notes had no business purpose. Victor testified that he did not expect to pay any money on these notes. Anna E. Gilfillan, one of the parties to the contract in the *Heyn* case, testified that the contract was set up as a loan "to avoid the tax." In our opinion, we said:

*The substance of the transaction is controlling.* In reality, there is a plain settlement of an employment contract dispute by a payment of $41,835 to the petitioner-employee in 1955. That sum is ordinary income to petitioner in 1955. [Emphasis supplied.]

The notes in the instant case were negotiable, unconditional, could have been discounted by the payee at any time, and were issued for a business purpose. Eight of the 10 notes have been paid by petitioner with royalties earned by him during the years of payment. The substance of the transaction here is that the $50,000 received by petitioner was borrowed money and not advance royalties.

It is true that absent the loan in the instant case the $50,000 would have been advance royalties and taxable as ordinary income when received in 1959. *Perfumers Manufacturing Corporation*, 33 T.C. 532. But we cannot ignore the loan. The notes evidencing the loan had a business purpose and were not a sham.

In view of the foregoing, we hold that the $50,000 received by petitioner in 1959 from Music Publishers Holding Corp. was a loan and as such did not constitute taxable income in that year except to the

extent of $5,000 of royalties earned and applied to the repayment of the first note in that year.

*Decision will be entered under Rule 50.*