278

MORRIS AND ANNETTE G. ALEXANDER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7389-70, 7668-70, 7669-70.   Filed November 26, 1973.

*George B. Collins*, for the petitioners.
*Lewis M. Porter, Jr.*, for the respondent.

FEATHERSTON, *Judge:* These proceedings involve deficiencies in individual income taxes and transferee liabilities for corporate income taxes determined by respondent as follows:

| Petitioner(s) | Docket No. | Year | Amount |
|---|---|---|---|
| Morris and Annette G. Alexander | 7389-70 | 1966 | $65,408.55 |
| | | 1967 | 1,129.00 |
| Morris Alexander, Transferee of Perma-Line Corp. of America (formerly Perma-Line Manufacturing Corp. of America), successor by merger to Perma-Line Midwest Corp | 7668-70 | | 3,225.00 |
| Morris Alexander, Transferee of Perma-Line Corp. of America (formerly Perma-Line Manufacturing Corp. of America) | 7669-70 | | 50,737.00 |

For convenience, Morris Alexander will be referred to herein as petitioner, Perma-Line Midwest Corp. as Midwest, and Perma-Line Corp. of America as Perma-Line.

---

[1] The proceedings of the following petitioners are consolidated herewith: Morris Alexander, Transferee of Perma-Line Corporation of America (Formerly Perma-Line Manufacturing Corporation of America), successor by merger to Perma-Line Midwest Corporation, docket No. 7668-70; and Morris Alexander, Transferee of Perma-Line Corporation of America (Formerly Perma-Line Manufacturing Corporation of America), docket No. 7669-70.

The following issues are presented for decision:

(1) Whether petitioner's liability of $149,602 on an open account with Perma-Line was canceled in connection with the liquidation of that corporation so that the amount of the account is taxable to him as a liquidation distribution under section 331(a)(1); [2]

(2) Whether $42,500 received by petitioner in 1966 from the purchasers of Perma-Line's assets was a nontaxable loan or a taxable advance commission payment under section 61;

(3) Whether petitioner is liable as transferee for any of Perma-Line's unpaid income tax liabilities which were contractually assumed by the purchasers of its assets;

(4) Whether Perma-Line, in computing its loss on the sale of its assets for the purposes of its final income tax return for the period ended January 31, 1967, properly allocated $104,000 of the sales price to "Officers Loans Receivable"; and

(5) Whether the period of limitations on the assessments of transferee liability, prescribed by section 6901(c), had expired when the notices of transferee liability were issued to petitioner.

FINDINGS OF FACT

## General

Morris and Annette G. Alexander, husband and wife, were legal residents of Chicago, Ill., at the time the petitions herein were filed. They filed their joint Federal income tax return for 1966 with the district director of internal revenue, Chicago, Ill.

Perma-Line Manufacturing Corp. of America was formed as an Illinois corporation in December 1960. Later it became the surviving corporation in a statutory merger with Perma-Line Midwest Corp. After the merger was completed on April 30, 1966, the corporation changed its name to Perma-Line Corp. of America.

Following the merger and until its liquidation, Perma-Line's outstanding capital stock was owned as follows:

| Shareholder | Number of shares (common stock— $10 par) | Percentage ownership |
|---|---|---|
| Morris Alexander | 3, 992 | 83. 17 |
| Fred Steinlauf | 693 | 14. 43 |
| Maurice Blonder | 115 | 2. 40 |
| Total | 4, 800 | 100. 00 |

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.

In addition to being its principal shareholder, petitioner was Perma-Line's president during this period.

Perma-Line was in the business of manufacturing and installing road-marking material. Its principal product was a hot extruded thermoplastic striping material used in marking traffic lanes. Distribution of its products was effected through sales made to franchise dealers which, prior to the merger, included Midwest.

By May 1, 1966, it became apparent that Perma-Line would need additional capital if its operations were to grow. From its inception through 1965, the company had experienced a steady growth in sales. After 1965 Perma-Line's business began to level off. It did not have sufficient capital to finance expanded operations, particularly funds for research and development work.

Perma-Line's lack of needed operating capital was caused, to a large extent, by the difficulty it had borrowing against the receivables it held from municipalities, villages, States, and transit authorities. Those receivables were slow-paying, could not be assigned, and were subject to warranties for repairs, replacements, and servicing. Under some of Perma-Line's agreements, the municipalities retained a portion of the contract price pending completion of a guarantee period, which ranged from 18 months to 3 years. Based on Perma-Line's experience, the most that could be borrowed against these receivables was an amount equal to between 30 and 40 percent of what was due. In the case of good industrial receivables, Perma-Line could borrow between 80 and 90 percent of the face amounts thereof.

During 1965 and 1966, the Pritzker and Freund families became interested in acquiring Perma-Line. These families had sufficient credit and money to provide the additional capital needed for Perma-Line's growth and expansion. On their behalf, Robert Wisener (hereinafter Wisener), an executive with over 30 years of experience in the traffic safety field, conducted a thorough investigation of the company and its possibilities for profit and growth.

Based on Wisener's year-long investigation of Perma-Line, the parties reasonably anticipated that within 2 or 3 years, the business would be capable of generating annual sales of $5 million, compared with gross receipts of $1,236,155.44 during its fiscal year ended April 30, 1966, and $1,332,577.23 during the period ended October 27, 1966.[3] This conclusion was premised on Wisener's finding that this industry was on the verge of a tremendous increase in business, that only one other company—Cataphote—both manufactured and installed thermoplastic highway striping, and that with the Pritzkers' money behind

---

[3] Approximately 80 percent of Perma-Line's gross business was done between May 1 and November 1 each year.

the operation, credit to operate the business could be more readily acquired. It was also anticipated that Wisener would run the business, thus giving it the benefit of his experience in this field.

### Arrangement for Sale of Perma-Line's Assets

The negotiations with Wisener came to fruition on October 13, 1966, when Perma-Line and petitioner, individually, entered into an agreement with Simon Zunamon (hereinafter Zunamon), nominee for the Pritzker and Freund groups, to sell substantially all of Perma-Line's assets to Zunamon and his principals under a contemporaneously created partnership to be known as Perma-Line Co. (hereinafter P-L). The transaction was to be closed on October 27, 1966, and the consideration for the sale was $150,000 in cash and the assumption of most of Perma-Line's liabilities.

P-L was formed on October 13, 1966, specifically to receive the assets of Perma-Line and to continue the operation of its business. The partners in P-L and their respective percentage interests in the partnership were as follows:

| Partner | Percentage interest |
|---|---|
| Seymour R. Gross, Trustee of LaSalle Trusts Nos. 1–40 (Grantor J. N. Pritzker) | 48 |
| Simon Zunamon, Trustee of Maurice Trusts Nos. 1–7 (Grantor Maurice Freund) | 24 |
| S. William Pattis, Trustee of Joyce Trusts Nos. 1–7 (Grantor Joyce Freund, wife of Henry L. Freund, son of Maurice Freund) | 24 |
| Jack E. Cheziwer, Trustee of Judy and Alan Trusts (Grantor Simon Zunamon) | 4 |
| Total | 100 |

In addition to the agreement by Perma-Line to sell its assets to P-L, the following papers, some of which are described in greater detail below, were executed by the parties on October 13, 1966:

1. Zunamon signed a letter, whereby he agreed to employ petitioner at an annual salary rate of $36,000, to render technical assistance and advice to P-L for the continued operation of the business;

2. Petitioner and Zunamon executed a document entitled "Sales Contract" in which petitioner was designated as the exclusive sales agent of P-L for a period of approximately 10 years;

3. Zunamon signed a letter to petitioner in which he agreed that petitioner could assign the sales contract agreement to any corporation in which petitioner was a majority shareholder; and

4. Petitioner and Zunamon signed a document entitled "Security Agreement" in which petitioner assigned his rights to a portion of the moneys payable to him under the sales contract as security for his liability in the total amount of $192,500. The parties have stipulated that

the notes, described below, in the amounts of $74,801.24, plus interest of 4 percent per annum, payable to the Maurice and Henry L. Freund Charitable Foundation (hereinafter Freund Foundation), and $74,801.23, plus interest of 4 percent per annum, payable to the Pritzker Foundation, were secured by this agreement.

As stated in "2" above, the sales contract designated petitioner as exclusive sales agent for a period ending April 30, 1976. Under paragraph 8 of the agreement, petitioner was to receive commissions on sales made by the business as follows:

Commissions shall be paid on net sales (as used herein, net sales shall mean gross sales of those products and services described in Exhibit A, less freight, cartage out, trade discounts, returns and allowances) as follows:

(a) 1% of all net sales up to $1,000,000.00.

(b) If net sales are in excess of $1,000,000.00 and up to $3,000,000.00, paragraph 8(a) shall be of no effect and commissions shall be paid in an amount equal to 3% of all net sales.

(c) If net sales are in excess of $3,000,000.00 and up to $5,000,000.00, an amount in addition to that specified in paragraph 8(b) equal to 2% of sales in excess of $3,000,000.00 but less than $5,000,000.00.

(d) If net sales are in excess of $5,000,000.00, an amount in addition to that specified in paragraph 8 (b) and (c) equal to 1% of sales in excess of $5,000,000.00.

As a practical matter, the term "net sales" as used in the agreement means gross sales of the products and services covered in the agreement.

Paragraph 9 further provides that: "On November 1, 1970, Manufacturer [Zunamon] shall pay to * * * [petitioner] the sum of Ten Thousand ($10,000.00) Dollars for services rendered under the terms of this Agreement." This amount was in addition to the payments petitioner was to receive under paragraph 8.

The sale of Perma-Line's assets to Zunamon as nominee was completed on October 27, 1966, in accordance with the terms of the October 13, 1966, sale agreement. Among the other assets owned by Perma-Line at the time the sale was closed were trade accounts receivable in the amount of $424,701.74 and accounts due from its officers in the total amount of $163,352. These trade accounts and $149,602 of the accounts due from officers were transferred then to the Pritzker Foundation.

The directors of Perma-Line, at a meeting held November 14, 1966, adopted a resolution authorizing the corporation's dissolution. The proceeds of the sale of Perma-Line's assets were distributed on that date as follows:

To Morris Alexander:
Cash _____ $117,741.14
Life insurance policy (cash surrender value) _____ 4,375.00

122,116.14

To Fred Steinlauf:
| | |
|---|---|
| Cash | $15,000.00 |
| To creditors on retained accounts payable | 12,883.86 |
| | |
| Total | 150,000.00 |

Perma-Line was dissolved on December 30, 1966.

### *Perma-Line's Accounts Receivable From Its Officers*

As stated above, among the assets owned by Perma-Line on October 27, 1966, were accounts due from officers in the total amount of $163,352. This amount included $149,602 owed by petitioner and $13,725 owed by Fred Steinlauf (hereinafter Steinlauf).[4] Each of these loan accounts receivable represented an open account indebtedness upon which no interest was charged. The account due from Steinlauf was not transferred to P-L but was retained by Perma-Line.

On October 27, 1966, prior to the closing of the assets sale, the Pritzker Foundation agreed to purchase for $400,000 all of Perma-Line's trade accounts receivable, as well as the $149,602 account due from petitioner to be evidenced by his promissory notes discussed below.

Under date of October 27, 1966, Zunamon sent a letter to Perma-Line directing the disposition to be made of Perma-Line's assets at the time of the closing of the sale transaction. The letter stated that Perma-Line was to assign to the Pritzker Foundation and to the Freund Foundation all listed trade accounts receivable and all notes or accounts due from its officers. All the other assets to be transferred under the agreement were to go to P-L.

Pursuant to this letter of October 27, 1966, the $149,602 open account debt owed by petitioner to Perma-Line was split, and one-half was assigned to the Pritzker Foundation and the other half to the Freund Foundation. Each half of this account was warranted by petitioner to be "based upon goods sold and delivered, cash advanced, and services rendered" and to be a good and valid receivable. The assignments of the account are valid on their face, in proper form, and sufficient to convey Perma-Line's interest in the account.

Under date of October 27, 1966, notes evidencing the indebtedness due from petitioner as reflected by the account were signed by him. One note in the amount of $74,801.23 is payable to the Pritzker Foundation and the other in the amount of $74,801.24 is payable to the Freund Foundation. Each note provides for interest at the rate of 4 percent per annum and that: "All payments shall be applied first to interest and then to principal." Payments of principal and interest on both notes are secured by the sales contract of October 13, 1966, and are to be made from "Excess Sales Commissions" due petitioner under that

---

[4] The record does not show who owed the remaining $25 nor the disposition of such account.

agreement. "Excess Sales Commissions" is defined in each note as "the first Twenty Thousand ($20,000.00) Dollars in excess of Fifty Thousand ($50,000.00) Dollars in commissions, and all commissions in excess of Ninety Thousand ($90,000.00) Dollars in any fiscal year as defined in said Sales Contract."

Several events occurred after the October 27, 1966, completion of the sale of Perma-Line's assets which prevented the purchasers' original expectations for the business from being realized. Several large companies entered the thermoplastic highway-striping and traffic safety field, thus intensifying the existing competition. Wisener died in the spring of 1968, and the individual chosen to succeed him as manager had no experience in this field and was not able to cope with the problems P–L was encountering. In addition P–L curtailed research and development expenditures.

On December 31, 1969, the notes of petitioner's held by the Pritzker Foundation and the Freund Foundation were assigned to P–L. On January 1, 1970, P–L was incorporated as Perma-Line Corp. of America (Perma-Line II), and on the same date Michigan General Corp. acquired all the outstanding capital stock of Perma-Line II.

Payments or credits from "Excess Sales Commissions" have been made on the two notes dated October 27, 1966, as follows:

| Year in which "Excess Sales Commissions" were realized under sales contract | Amount paid or credited |
| --- | --- |
| 1968 | $4, 706. 15 |
| 1969 | 8, 412. 59 |
| 1970 | 8, 127. 86 |
| 1971 | 3, 001. 00 |
| 1972 | 7, 000. 00 (estimated) |

*The $42,500 Advanced to Petitioner on October 27, 1966*

As noted above, one of the documents signed on October 13, 1966, was a letter agreement whereby Zunamon agreed to employ petitioner for a salary at the yearly rate of $36,000. Petitioner was "to render such technical assistance and advice as is necessary to facilitate the continued operation of the business carried on by Perma-Line Corporation of America." In another agreement entitled "Sales Contract," signed on the same date, Zunamon agreed to appoint petitioner as "exclusive sales agent" from the date of the agreement through April 30, 1976. Petitioner was to receive commissions on all sales by the business pursuant to paragraph 8—quoted above—of this agreeement.

On October 27, 1966, petitioner received $42,500 from P–L. On the same date, he signed two promissory notes in the principal

amounts of $7,500 and $35,000, each providing for interest at the rate of 4 percent per annum.

Both the principal and interest of the $7,500 note are payable from "Excess Sales Commissions." As in the case of the notes payable to the Pritzker Foundation and the Freund Foundation, the term "Excess Sales Commissions" is defined in this note as "the first Twenty Thousand ($20,000.00) Dollars in excess of Fifty Thousand ($50,000.00) Dollars in commissions, and all commissions in excess of Ninety Thousand ($90,000.00) Dollars in any fiscal year as defined in said Sales Contract." Also, payments are to be applied first to interest and then to principal.

Both the principal and interest of the $35,000 note are to be paid from the first $50,000 of commissions earned under the sales contract if "total sales commissions due in any fiscal year, * * * exceed the sum of Two Hundred Thousand ($200,000.00) Dollars." The note further provides that amounts due under it will be payable only after the notes payable to the Pritzker Foundation and the Freund Foundation have been paid.

### Perma-Line's Trade Accounts Receivable

In the assets sale completed on October 27, 1966, as noted above, trade accounts receivable in the amount of $424,701.74 were transferred. These accounts included 20 due from municipalities in the total amount of $193,519.05 and 21 due from distributors and contractors in the total amount of $231,182.69.

During each taxable period, Perma-Line experienced some bad debt losses. As of April 30, 1966, without regard to the merger with Midwest on that date, Perma-Line reported net trade accounts receivable of $245,410.56 and, based on the specific writeoff method, claimed a deduction of $14,031.25 for bad debts. For the same fiscal year, Midwest reported net trade accounts receivable of $228,656.62 and, based on the specific writeoff method, claimed a bad debt deduction of $298.15. For its taxable period May 1, 1966, through January 31, 1967, Perma-Line wrote off $21,594.87 as bad debts.

For the reasons stated above, the accounts due from municipalities were not as readily usable for credit security as were industrial accounts. Moreover, Perma-Line's obligations on warranties extended to repairs, replacements, and the servicing of claims arising out of its installation contracts. Perma-Line incurred repair expenses of $8,047.44 in its taxable year ended April 30, 1966, and $22,472.62 in its taxable period ended January 31, 1967.

Certain contracts with the City of New York contemplated a retention of 10 percent of the contract price pending completion of a guarantee period ranging from 18 months to 3 years. Trade accounts receivable balances as of October 26, 1966, resulting from retained

percentages of contract prices amounted to $51,886.80; of this amount, $28,827.89 was due on completed contracts with the City of New York. Several of these contracts with the City of New York were 2 to 3 years old.

### Assets of Perma-Line Transferred to Petitioner

On October 27, 1966, the sale of Perma-Line's assets to Zunamon was closed. Perma-Line retained certain bank balances, the cash surrender value of a life insurance policy, and the account receivable owed by Steinlauf. All its other assets were transferred to P–L or to others designated in the closing instructions. In exchange for the transfer, Perma-Line received the following consideration:

| | | |
|---|---:|---:|
| Cash | | $150, 000 |
| Less: | | |
| Credit for retained bank balances and cash surrender value of life insurance policy | 35, 644 | $114, 356 |
| Assumption by purchasers of liabilities reflected on Perma-Line's books, as adjusted by agreement of the parties | | 341, 979 |
| Total | | 456, 335 |

Figures have been rounded to nearest dollar amount.

In addition the purchasers expressly assumed liabilities for any Federal income taxes owed by Perma-Line at the time of the sale and for accrued royalty expenses. On its balance sheet as of September 30, 1966, attached to the sale agreement, Perma-Line made provision for these liabilities in the amounts of $128,000 and $78,476.36, respectively.

Perma-Line transferred the following noncapital assets under the October 13, 1966, sale agreement:

| Item | Cost or other basis | Reserve for depreciation |
|---|---:|---:|
| Bid checks | $5, 360 | |
| Petty cash | 375 | |
| Deposits | 425 | |
| Trade accounts receivable | 424, 702 | |
| Obligation due from Perma-Line Atlantic | 19, 368 | |
| Inventory | 125, 717 | |
| Fixed assets | 261, 636 | $151, 306 |
| Leasehold improvements | 3, 419 | 1, 140 |
| Construction in progress | 12, 084 | |
| Prepaid expenses | 5, 549 | |
| Advances—out-of-town installation | 698 | |
| Reserve for N.Y. State income tax | 1, 170 | |
| Total | 860, 503 | 152, 446 |

Figures have been rounded to nearest dollar amount.

Perma-Line also transferred its capital assets, i.e., 100 shares of Perma-Line Atlantic Corp. stock, in which it had a basis of $20,395.98, and the account receivable due from petitioner in the amount of $149,602.

The proceeds of the sale of Perma-Line's assets were distributed on November 14, 1966, in the manner stated above. As also mentioned earlier in our Findings, Perma-Line's dissolution was completed on December 30, 1966.

### Midwest's Income Tax Liabilities

In its final income tax return, filed on October 17, 1966, for its fiscal year ended April 30, 1966, Midwest reported a net operating loss of $1,721.49. Based on this loss, Midwest claimed a net operating loss carryback to its fiscal year ended April 30, 1963, and a refund of $895 was tentatively allowed and issued on November 16, 1966.

As a result of the examination of the income tax returns of Midwest, respondent determined deficiencies of $895 and $2,330 for the fiscal years ended April 30, 1963, and April 30, 1966. For Midwest's fiscal year ended April 30, 1966, respondent determined that Midwest had taxable income of $4,854 and a tax liability of $2,330 rather than a loss of $1,721.49, as reported. For the fiscal year ended April 30, 1963, respondent determined that the tentative allowance, in the refund of $895, was erroneous.

### Perma-Line's Income Tax Liabilities

Subsequent to Perma-Line's dissolution, accountants employed by the purchasers of its assets prepared Perma-Line's final income tax return for the taxable period ended January 31, 1967. The return was signed by petitioner, as president of Perma-Line, and was filed on July 3, 1967. The following losses from the sale of Perma-Line's assets were claimed on the return:

| Item | Gross sales price | Depreciation allowed (or allowable) since acquisition | Cost or other basis | Loss |
|---|---|---|---|---|
| Long term capital loss: | | | | |
| 100 shares Perma-Line Atlantic Corp | $462 | ------------ | $20, 396 | $19, 934 |
| Officers loans receivable | 104, 000 | ------------ | [1] 163, 352 | 59, 352 |
| Total long-term capital loss | | | | 79, 286 |
| Ordinary loss: | | | | |
| Bulk sale of (noncapital) assets | [2] $351, 873 | $152, 446 | $860, 503 | $356, 184 |

Figures have been rounded to nearest dollar amounts.

[1] As mentioned previously in our Findings, only $149,602 of these accounts was actually transferred to P-L.
[2] $296,000 of this amount was allocated to the trade accounts receivable.

Taking these loss computations into account, Perma-Line reported in its final return for the taxable period ended January 31, 1967,

a net operating loss of $88,378.52. By means of an application for tentative carryback adjustment filed on June 29, 1967, it claimed this loss as a net operating loss carryback to be applied to the taxable year ended April 30, 1966, for which income taxes were paid. Respondent allowed the application and also tentatively allowed an overpayment of tax resulting therefrom, and issued a refund of income tax in the amount of $41,583. Pursuant to the October 13, 1966, agreement for the sale of Perma-Line's assets, the refund was paid to the purchasers rather than to petitioner.

Subsequently, Perma-Line's income tax returns for the taxable year ended April 30, 1966, and the taxable period ended January 31, 1967, were examined and deficiencies in the respective amounts of $41,583 and $9,154 were determined. These deficiencies were based on the following adjustments:

(a) For the taxable period ended January 31, 1967, it was determined that the loss of $356,183.82 claimed in the tax return was overstated by $104,000. This overstatement was determined to be attributable to the allocation of $296,000 of the sale price to trade accounts receivable whereas respondent determined that $400,000 of the proceeds was properly allocable thereto. For this taxable period, respondent also disallowed the following deductions not here in dispute:

| | |
|---|---:|
| Officer's salary [5] | $15,000 |
| Political contributions | 675 |
| Penalty | 415 |
| Franchise tax | 900 |

(b) For the fiscal year ended April 30, 1966, the notice of deficiency states that "the tentative allowance of $41,583.00 for the year ended 4/30/66 based on the loss carried back from the year ended 1/31/67 is now reversed resulting in a deficiency of $41,583.00." In addition, royalty income was increased by $18,150.84.[6]

### Determination of Petitioner's Transferee Liabilities

Respondent determined that petitioner is liable as transferee for the unpaid income taxes of Midwest and Perma-Line as follows:

| Taxable period ended | Amount |
|---|---:|
| *Midwest* | |
| Apr. 30, 1963 | $895 |
| Apr. 30, 1966 | 2,330 |
| *Perma-Line* | |
| Apr. 30, 1966 | $41,583 |
| Jan. 31, 1967 | 9,154 |

[5] The "officer's salary" issue, placed in dispute by the pleadings, has been conceded by respondent.

[6] The "royalty income" determination was placed in issue in the petition but was not argued in petitioner's brief. We have treated it as conceded.

*Determination of Petitioner's Individual Income Tax Liabilities*

In their income tax return for 1966, petitioners reported capital gain of $117,741.14 on the liquidation of Perma-Line. Respondent determined that petitioners' capital gain should be increased by $149,602 ("Amounts derived from release of your indebtedness to the corporation for funds previously received by you") and $4,375 ("Proceeds in form of life insurance policy, cash value"). In addition to certain other adjustments not in dispute, respondent further determined that petitioner received advance commission income in the amount of $42,500, this being the amount he received on October 27, 1966.

### OPINION

### *Issue 1. Perma-Line's Account Due From Petitioner*

Section 331(a)(1) provides that amounts distributed in complete liquidation of a corporation shall be treated as having been received in exchange for the stock. The gain or loss to a shareholder from a distribution in complete liquidation of a corporation is to be determined under section 1001 by comparing the amount of the distribution with the cost or other basis of the stock. Sec. 1.331–1(b), Income Tax Regs. Where a debt owed to a corporation by a shareholder is canceled in connection with a complete liquidation, the amount of the debt is treated as a distribution under section 331(a)(1). *Sam Weisberger*, 29 B.T.A. 83 (1933).

Both parties appear to recognize these basic principles of law. They also agree that petitioner owed Perma-Line $149,602 at the time of the assets sale to Zunamon, and we think it quite apparent that the assets sale was a step leading to the November 14, 1966, distribution of Perma-Line's cash and other remaining assets to its shareholders and certain creditors. The crucial issue, a purely factual one, is whether the related sale and distribution of assets caused a cancellation of petitioner's indebtedness to Perma-Line.

While the issue is not free from doubt, we think the evidence supports petitioner—that the $149,602 debt was not canceled in connection with the liquidation. The documentary evidence is clear. The assets sale agreement of October 13, 1966, clearly covered the account owed by petitioner. The Pritzker Foundation's agreement with P-L to buy the account, as well as Perma-Line's trade accounts receivable, was legally sufficient to effectuate the transfer of the account. Zunamon's letter of October 27, 1966, instructing Perma-Line to transfer "all notes or accounts due from officers" to the Pritzker Foundation and the Freund Foundation, obviously covered the account due from

petitioner.[7] Similarly, the notes executed by petitioner to those foundations, though payable only from a specified source, are valid on their face. Thus, the documentary evidence refutes respondent's position that the account due from petitioner was canceled in connection with the liquidation.

Respondent maintains, however, that these papers were designed "to hide the fact" that the account "was really extinguished." He argues that there is no substantial evidence showing there was any real prospect that there would ever be sufficient "Excess Sales Commissions"—as defined in the notes—under the sales contract of October 13, 1966, to pay the notes and that, consequently, petitioner's indebtedness was effectively canceled.

An evaluation of this argument requires an analysis of the operation of the commissions formula provided by the sales contract and of the "Excess Sales Commissions" formula set forth in the notes. Under the sales contract, if annual net sales were over $1 million and up to $3 million, petitioner would receive 3 percent of all net sales, or from $30,000 to $90,000. On all sales in excess of $3 million and up to $5 million, he would receive an additional 2 percent of such excess; therefore, if the sales actually reached $5 million per annum, petitioner would be entitled to total commissions of $130,000. Under the "Excess Sales Commissions" formula prescribed in the notes, the first $20,000 above $50,000 in commissions and all commissions in excess of $90,000 are to be applied on the notes.

Thus, nothing would be paid on the notes unless annual net sales exceeded $1,666,666, an amount sufficient to produce commissions of $50,000. However, if P-L had annual net sales of approximately $2,330,000, petitioner would have been entitled to commissions of about $70,000; the sum of $20,000 would have been applied on the notes annually; and the notes would have been fully paid long before April 30, 1976, the expiration date of the sales contract. If P-L's net sales had reached the anticipated $5 million, the notes would have been paid off within 3 years, and there would have been excess commissions to spare.

What, then, were the reasonably anticipated prospects of the business in the light of the economic realities as of October 1966? Cf. *C.M. Gooch Lumber Sales Co.*, 49 T.C. 649 (1968), remanded pursuant to a stipulation of the parties 406 F.2d 290 (C.A. 6, 1969). Our

---

[7] The record clearly shows that the account due from Steinlauf was retained by Perma-Line. While Zunamon's letter of Oct. 27, 1966, suggests that petitioner's account, as well as the Steinlauf account and the unidentified account for $25, was transferred to the foundations, the letter of the same date from the Pritzker Foundation refers only to petitioner's account and the trade accounts receivable. In view of the lack of evidence relating to the unidentified $25 account, we have assumed it was not transferred to either the foundations or to P-L.

Findings show that during the fiscal year ended April 30, 1966, Perma-Line had sales of $1,236,155.44. During the 6-month period of May 1, 1966, to October 27, 1966, the date of completion of the assets sale, the sales amounted to $1,332,577.23. This was the first taxable period following the merger with Midwest. We do not have any precise figures on sales by the business after it was transferred to P-L, but they evidently rose to a sum in excess of $1,666,666 since "Excess Sales Commissions" ranging from $3,001 to $8,413 have been applied on the notes during the period from 1968 through 1972.

We think the evidence supports our finding that the parties anticipated a substantially larger upswing in sales than occurred. By April 30, 1966, the sales had reached a plateau, and their failure to increase more rapidly was due to Perma-Line's lack of needed operating capital. The Pritzker and Freund families were in a position to provide the needed capital and were expected to do so.[8] The full amount of the projected growth did not occur because of the untimely death of Wisener in the spring of 1968, the lack of experience on the part of his successor in managing the business, unanticipated competition, and the curtailment of P-L's research and development expenditures.

We think the evidence shows that petitioner's open account indebtedness of $149,602 was not canceled in connection with the liquidation. While petitioner may realize income in some subsequent year if he is ultimately relieved of his obligation to pay the notes, he did not do so in 1966.

*Issue 2. The $42,500 Advanced to Petitioner*

The $42,500 advanced to petitioner in October 1966 in the form of a purported loan was taxable income in his hands when it was received. The funds were advanced to petitioner by his employer, and under the terms of the $35,000 and $7,500 notes payable to P-L, petitioner was obligated to repay the advance only from future commissions payable by his employer. If petitioner's right to commissions under the sales contract of October 13, 1966, should terminate in any way or if peti-

---

[8] Since petitioner had negotiated the assets sale, worked with Wisener during his year-long investigation, and agreed to work for P-L, serving as its exclusive sales agent, he was in a position to testify as to the purchasers' plans as disclosed to him. Citing *Stoumen v. Commissioner*, 208 F.2d 903, 907 (C.A. 3, 1953), and *William O'Dwyer*, 28 T.C. 698, 703 (1957), affd. 266 F.2d 575 (C.A. 4, 1959), certiorari denied 361 U.S. 862 (1959), respondent argues that petitioner's failure to call Pritzker and Freund to corroborate his testimony as to the financial plans for the business raises an inference that their testimony would have been unfavorable. This argument misconceives the "absent witness" rule. Cf. *Kean v. Commissioner*, 469 F.2d 1183, 1187–1188 (C.A. 9, 1972), affirming in part and reversing in part 51 T.C. 337 (1968). Both Pritzker and Freund were equally available to both parties, and as to part of the liability here in question, their interests are adverse to those of petitioner.

tioner's commissions under that agreement should prove insufficient to cover the repayment, petitioner is subject to no enforceable obligation to repay the advance. If the commissions should be sufficient to repay all or a portion of the advance, the repayment transaction, in substance, would involve merely bookkeeping entries—notations to reflect P–L's payment of the commissions and a credit on the notes.

In the light of these facts, the $42,500 advance was quite clearly income taxable to petitioner when it was received in 1966. *Bouchard* v. *Commissioner*, 229 F.2d 703 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court; cf. *Victor H. Heyn*, 39 T.C. 719 (1963). The situation is not one where an employee's repayment obligation is an unqualified one. See *Harold Arlen*, 48 T.C. 640 (1967).

Moreover, petitioner has not shown that there was any reasonable expectation that the $35,000 note given in partial exchange for the advance would be repaid. Cf. *C.M. Gooch Lumber Sales Co.*, 49 T.C. 649 (1968). As reflected in our Findings, that note provides that the principal and interest thereon are to be paid from the first $50,000 of commissions earned under the sales contract if "total sales commissions due in any fiscal year, * * * exceed the sum of Two Hundred Thousand ($200,000.00) Dollars." Under the schedule contained in the sales contract for computing annual commissions, this would require sales in excess of $12 million per year and full discharge of the notes to the foundations before any payments would be due under the note. There is nothing in the record suggesting that the parties anticipated that P–L would ever have that volume of sales.

### Issue 3. Transferee Liability

Section 6901 [9] authorizes the assessment of transferee liability, at law or in equity, against a transferee of property for the tax liability of another taxpayer "subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." This section merely provides a secondary method for enforcing the existing liability of the transferor; it does not create a separate liability. *Patricia E. Mysse*, 57 T.C. 680, 700–701 (1972); *C.B.C. Super Markets, Inc.*, 54 T.C. 882, 897–898 (1970). The substantive questions of "the existence and extent" of the transferee's liabil-

---

[9] SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred :

    (1) INCOME, ESTATE, AND GIFT TAXES.—

        (A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

            (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

ity for the transferor's obligations must be determined in accordance with applicable State law, see, e.g., *Commissioner* v. *Stern*, 357 U.S. 39, 45 (1958), and the burden of showing that "a petitioner is liable as a transferee of property" rests with respondent, sec. 6902(a).[10]

As the foundation for his determinations that petitioner is liable as transferee for the income taxes of Midwest and of Perma-Line in the respective amounts of $3,225 and $50,737, plus interest, respondent relies upon the Illinois fraudulent conveyances statute which provides that any transfer made to "disturb, delay, hinder or defraud creditors" shall be void as against such creditors. Ill. Ann. Stat. ch. 59, sec. 4 (Smith-Hurd 1972).[11] Under this statute, where a transfer by a debtor is made without consideration and the debtor is rendered insolvent by the transfer, "the burden of dispelling the implication of fraud as against the pre-existing creditors is upon the debtor and his grantee." *Thompson* v. *Williams*, 6 Ill.2d 208, 127 N.E.2d 457, 460 (1955).

In the Perma-Line liquidation distribution of November 14, 1966, the corporation received no consideration except the surrender of its outstanding stock, and it was stripped of all its assets. Quite clearly, it was rendered insolvent by the liquidation and unable to pay any of its existing debts. Accordingly, under the Illinois law, the distribution is considered to be a fraud on existing creditors, and petitioner is liable, as a transferee, for the indebtedness then owed by Perma-Line to the extent of the value of his receipts, plus interest as provided by law. *Collegiate Cap & Gown Co.*, 59 T.C. 449, 455 (1972); *Landers, Frary & Clark* v. *Vischer Products Co.*, 104 F. Supp. 411, 417 (N.D. Ill. 1952), affd. 201 F. 2d 319, 324 (C.A. 7, 1953); see *First Nat. Bank of Chicago* v. *Commissioner*, 255 F. 2d 759 (C.A. 7, 1958), affirming sub nom. *Marva Trotter Barrow Spaulding*, 27 T.C. 479 (1956).

Under the Illinois statute, the indebtedness for which a transferee-without-adequate-consideration is liable may be contingent or unliquidated. See *Landers Frary & Clark* v. *Vischer Products Co.*, 201 F. 2d at 323. Thus, for the Government to qualify as a creditor under that statute, the taxes for which the insolvent debtor is liable need only have been incurred when the transfer is made, and it is immaterial whether they had been assessed or even discovered at that time. The

[10] SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES.

(a) BURDEN OF PROOF.—In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

[11] Ill. Ann. Stat. ch. 59, sec. 4 (Smith-Hurd 1972), is as follows:

Sec. 4. Fraudulent conveyances

Every gift, grant, conveyance, assignment or transfer of, or charge upon any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to disturb, delay, hinder or defraud creditors or other persons, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons.

fact that the income on which the tax is levied had been derived from operations conducted prior to the liquidation distribution is sufficient to give the Government the status of an existing creditor under the statute. *Scott* v. *Commissioner*, 117 F. 2d 36, 38 (C.A. 8, 1941), affirming a Memorandum Opinion of this Court; *Francis L. Hine*, 54 T.C. 1552, 1558 (1970); accord *United States* v. *Goldblatt Bros.*, 128 F. 2d 576, 579–580 (C.A. 7, 1942), certiorari denied 317 U.S. 662 (1942).

The Illinois statute does not apply to indebtedness created subsequent to the transfer where the transferee was not responsible for the creation thereof. In other words, if the indebtedness is created subsequent to the transfer as a result of the action of the creditor, the transferee is not liable for such indebtedness. *Bush* v. *Downey*, 195 Ill. 82, 62 N.E. 868 (1902). The origin, nature, and timing of the indebtedness must, therefore, be examined.

Respondent's determinations of transferee liability relate principally to the income taxes of Perma-Line for the fiscal period ended January 31, 1967, and the taxable year ended April 30, 1966. The return for the period ended January 31, 1967, as filed, reported a net operating loss of $88,378.52. This loss was carried back to the taxable year ended April 30, 1966, and a refund of $41,583 was issued to the purchasers of Perma-Line's assets on the basis of an application for a tentative carryback adjustment. This application was filed on June 29, 1967, long after petitioner had received the proceeds of the transfer from Perma-Line. Still later, Perma-Line's returns were examined, and respondent determined that the refund was erroneous.

Thus, the liability for the fiscal 1966 taxes arose from a postliquidation refund and petitioner did not enjoy its proceeds. At the time his share of Perma-Line's assets was distributed to him, no income taxes were owed on income derived from the corporation's operations for the taxable year ended April 30, 1966. Taxes for that taxable year became due only after Perma-Line had been liquidated and dissolved. Therefore, petitioner is not liable as transferee for any of Perma-Line's income taxes attributable to the tentative allowance of the net operating loss carryback adjustment. *Francis L. Hine, supra* at 1560–1562; *Elaine Yagoda*, 39 T.C. 170, 184–185 (1962), affirmed on other issues 331 F. 2d 485 (C.A. 2, 1964).

Similarly, in the case of Midwest, based on the allowance of a tentative net operating loss carryback adjustment from fiscal 1966 to fiscal 1963, a refund of $895 was issued on November 16, 1966, to the purchasers of Perma-Line's assets. Subsequently, respondent determined a deficiency in Midwest's income tax liability for fiscal 1963. Since this tax of $895 was attributable to a refund issued after his share of

Perma-Line's assets had been distributed to him, petitioner is not liable as transferee for this portion of the corporation's indebtedness.[12]

As to the Midwest and Perma-Line income tax deficiencies attributable to income derived from operations or from the sale of Perma-Line's assets, petitioner is liable as transferee. These were liabilities, though not then determined or assessed, which existed at the time of the November 14, 1966, transfer. The Midwest deficiency in the amount of $2,330 determined for the fiscal year ended April 30, 1966, has not been shown to be erroneous in any respect. As to the Perma-Line deficiency for the taxable period ended January 31, 1967, there is a contest, discussed below, as to the allocation of the proceeds of the sale of the accounts receivable, and the amount of the deficiency, if any, under the conclusions reached herein will be a subject of the Rule 50 computation.

Petitioner advances several arguments, all without merit, to support his position that he incurred no transferee liability in connection with the liquidation of Perma-Line. His principal argument on the merits of the claim is that he caused Perma-Line to make adequate provision for its subsequently determined tax liabilities by exacting a promise from the assets purchasers, undeniably solvent,[13] to assume and pay such liabilities.

Respondent no doubt could have pursued a claim against the purchasers on the theory that the Government is third-party beneficiary of the contract, see, e.g., *United States* v. *Scott*, 167 F.2d 301 (C.A. 8, 1948), or could have sought to hold the purchasers liable as transferees "at law," sec. 6901(a)(1). But he did not do so, and his failure to do so does not exonerate petitioner. Transferee liability is several. That the purchasers of Perma-Line's assets agreed to assume and pay its tax liability does not alter the fact that the liquidating distribution on November 14, 1966, rendered Perma-Line insolvent. *Estate of E. Brooks Glass, Jr.*, 55 T.C. 543, 574 (1970), affirmed per curiam 453 F.2d 1375 (C.A. 5, 1972), petition for rehearing denied 460 F.2d 321 (C.A. 5, 1972); *Francis L. Hine*, 54 T.C. at 1558-1560. The assumption of Perma-Line's liability, without the consent of the creditor, does not obviate the fraud. "There is no privilege to relegate a creditor to a

---

[12] The evidence is not explicit that this $895 refund was received by the purchasers rather than petitioner. We infer that it was, however, from the stipulation that a total of $150,000, the exact amount of the purchase price of the assets, was distributed on Nov. 14, 1966. In any event, respondent had the burden of showing all transfers to petitioner, sec. 6902(a), and he has not shown that any part of this tax refund was issued to petitioner.

[13] It is stipulated:

"The persons and entities which acquired the assets of Permaline [sic] Manufacturing Corporation of America under the Agreement in evidence as * * * [sale agreement of Oct. 13, 1966] were, at all relevant times, solvent and responsible parties well able to pay the sums claimed by the Government to be due from Permaline [sic]. The fact of such solvency was known to Petitioner at all times through October, 1966."

different payor without his consent." *Landers, Frary & Clark* v. *Vischer Products Co.,* 104 F.Supp. at 417.

*Issue 4. Allocation of the Sales Proceeds Among Perma-Line's Assets*

The only adjustment respondent made in the determination of Perma-Line's income tax for the taxable period ended January 31, 1967, which has not been settled is the reallocation of an additional $104,000 of the purchase price to trade accounts receivable. This adjustment, along with others not in dispute, extinguished the net operating loss claimed in Perma-Line's return and produced the determined deficiency for that period. For the reasons discussed above, since the assets sale occurred before the liquidation distribution by Perma-Line, petitioner is liable as transferee for any tax on the gain resulting from the sale.

The general rule for determining gain or loss on the bulk sale of the assets of a business is that the amount realized on the sale should be allocated among the assets according to their fair market values at the time of the sale. *F. & D. Rentals, Inc.* v. *Commissioner,* 365 F.2d 34, 40 (C.A. 7, 1966), affirming 44 T.C. 335 (1965). In its final return, Perma-Line treated $400,000, the amount paid by the Pritzker Foundation for both the trade accounts receivable (face amount of $424,702) and the account due from petitioner ($149,602), as the amount received for both sets of accounts and allocated $296,000 of the receipts to trade accounts receivable and $104,000 to "Officers Loans Receivable." Consistent with his position that petitioner's open account indebtedness of $149,602 was canceled as one feature of the liquidation of Perma-Line, respondent determined that the full $400,000 should be allocated to trade accounts receivable. Since the trade accounts receivable were noncapital assets and the "Officers Loans Receivable" was a capital asset, the effect of this determination was to decrease the amount of the ordinary loss realized by Perma-Line on the assets sale. The burden of proof as to the proper allocation rests with petitioner. Sec. 6902(a).

In the above discussion of Issue 1, respondent's position that the liquidation of Perma-Line effectuated a cancellation of petitioner's liability for this $149,602 was rejected. Accordingly, some part of the $400,000 paid by the Pritzker Foundation for both sets of accounts receivable is allocable to the account owed by petitioner. The issue as to the amount properly allocable to each set of accounts is a purely factual one.

Although the record is not entirely satisfactory, it details several factors which affected the fair market values of both the trade accounts and the account due from petitioner. Almost half of the trade accounts were due from municipalities. These accounts were slow-

paying, subject to warranties, and difficult to use as security for loans. Some of the amounts due, as noted in our Findings, had been retained by municipalities for 2 or 3 years, ostensibly to assure proper performance of the contracts. In Perma-Line's final return, a bad debt deduction of $21,594.87 was claimed and was not challenged. The account due from petitioner, on the other hand, was not negotiable, and its payment prior to the sale was unsecured. The record does not reflect petitioner's financial condition at the time, but respondent does not contend that petitioner was not financially able to pay the debt.

Based on our consideration of the record as a whole, we conclude that the fair market values of the trade accounts and the account due from petitioner were $320,000 and $80,000, respectively. The sales price for the two sets of accounts should be allocated accordingly for the purpose of computing the gain or loss on the assets sale.

### Issue 5. Statute of Limitations

As a general rule, under section 6501(a), the amount of any income tax "shall be assessed within 3 years after the return was filed." The deficiencies of Perma-Line for the fiscal year ended April 30, 1966, and of Midwest for the fiscal year ended April 30, 1963, were attributable to the allowance of tentative net operating loss carryback adjustments. In this connection, section 6501(h) provides that:

In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback * * * such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss * * * which results in such carryback may be assessed, * * *

Midwest's income tax return for the taxable year ended April 30, 1966, was filed October 17, 1966, and the 3-year period expired October 17, 1969. Perma-Line's income tax return for the taxable period ended January 31, 1967, was filed July 3, 1967, and the 3-year period expired July 3, 1970. The notices of liability were mailed to petitioner on September 18, 1970, beyond both of the 3-year periods for the assessments of deficiencies against Midwest and Perma-Line. However, section 6901(c)(1),[14] prescribing the period of limitations for transferee liability, provides that such period shall terminate "1 year after the expiration of the period of limitation for assessment against the transferor." Thus, under this statute, the notices of liability issued to petitioner were timely.

---

[14] SEC. 6901. TRANSFERRED ASSETS.

(c) PERIOD OF LIMITATIONS.—The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows:

(1) INITIAL TRANSFEREE.—In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;

Petitioner argues that the extra year provided in section 6901(c)(1) applies only if respondent has made a timely assessment against the transferor, and that notices of deficiency were sent to neither Midwest nor Perma-Line prior to the expiration of the 3-year statute of limitations. For this reason, petitioner argues that the additional 1-year period provided in section 6901(c)(1) does not apply.

Petitioner's argument has been made before and repeatedly has been rejected by the courts. It is well settled that there is no need for the issuance of a statutory notice of deficiency in order to impose liability on the transferee, for to make such a requirement when the taxpayer has been dissolved and has no assets is to require a useless act. *United States* v. *Floersch*, 276 F. 2d 714, 717 (C.A. 10, 1960), certiorari denied 364 U.S. 816 (1960); *Ray A. Maher*, 55 T.C. 441, 458 (1970), remanded on other grounds 469 F. 2d 225, 230 (C.A. 8, 1972); *Henry A. Kuckenberg*, 35 T.C. 473, 482–483 (1960), affirmed on this issue 309 F.2d 202, 206 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963). These holdings find direct support in the legislative history of the predecessors of sections 6212(a) and 6213(a). H. Rept. No. 356, 69th Cong., 1st Sess. (1926), 1939–1 C.B. (Part 2) 372.

We hold the notices of liability were timely.

To reflect the foregoing conclusions,

*Decisions will be entered under Rule 50.*